Opinion by Justice Lang
In this consolidated interlocutory appeal and mandamus proceeding, we must decide whether appellees/real parties in interest, a group of limited liability companies[1] (collectively, "Panda"), are barred from proceeding with claims of fraud, negligent misrepresentation, and breach of fiduciary duty against appellant/relator Electric Reliability Council of Texas, Inc. ("ERCOT") based on representations by ERCOT respecting future demand for electric power in Texas. In the trial court, ERCOT filed two pleas to the jurisdiction, asserting Panda's claims are barred because (1) the State's sovereign immunity extends to ERCOT as to this lawsuit and (2) alternatively, the Public Utility Commission of Texas ("PUC") has exclusive jurisdiction over Panda's claims. The trial court denied those jurisdictional pleas.
In this Court, ERCOT asserts in two issues that the trial court erred by denying its pleas to the jurisdiction. Further, ERCOT contends this Court has appellate jurisdiction over this case pursuant to *301 section 51.014(a)(8) of the Texas Civil Practice and Remedies Code, see TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(8) (West Supp. 2017), or, alternatively, mandamus jurisdiction pursuant to Texas Government Code section 22.221(b), see TEX. GOV'T CODE ANN. § 22.221(b) (West Supp. 2017).
We conclude this Court lacks jurisdiction as to ERCOT's interlocutory appeal, but has mandamus jurisdiction over this case. Additionally, we decide in favor of ERCOT as to the trial court's denial of its plea to the jurisdiction based on sovereign immunity. We need not reach ERCOT's issue respecting its plea to the jurisdiction based on exclusive jurisdiction.
We dismiss ERCOT's interlocutory appeal for lack of jurisdiction. Further, we conditionally grant ERCOT's petition for writ of mandamus and direct the trial court to vacate its order denying ERCOT's plea to the jurisdiction based on sovereign immunity and dismiss this case for lack of jurisdiction.
I. FACTUAL AND PROCEDURAL CONTEXT
In 1999, the Texas Legislature enacted Chapter 39 of the Texas Public Utility Regulatory Act ("PURA") to restructure the electric utility industry in Texas. See TEX. UTIL. CODE ANN. §§ 39.001 -.916 (West 2016). Pursuant to PURA section 39.151, the PUC was required to certify an "independent system operator" ("ISO") to, among other functions, "ensure the reliability and adequacy of the regional electrical network." See id. § 39.151(a) - (c). In 2001, the PUC certified ERCOT, a Texas non-profit corporation, as the ISO.
We quote Panda's live petition at length because it clearly identifies Panda's position. Panda contended in part (1) "[a]s part of its responsibilities as an ISO, ERCOT publishes market data for use by those who participate in the ERCOT market"; (2) in approximately 2011 and 2012, ERCOT "sponsored false and misleading market reports describing capacity, demand, and reserves in the ERCOT region" (the "CDRs") and "broadcast[ ] the false market information throughout the state" via ERCOT's website, ERCOT press releases, and "ERCOT sponsored interviews with the press"; (3) additionally, ERCOT representatives "confirmed" the "CDR results" at presentations and meetings in Texas; (4) within the ERCOT region, "the CDRs or similar reports form the basis of investment analysis and drive the investment" as to construction of new power plants; (5) Panda "relied on [ERCOT's] representations to build three power plants at a cost of $2.2 billion"; (6) "[a]fter the investments were irrevocably committed and after the power plants were under construction, [ERCOT] admitted that its earlier representations were false"; and (7) the consequences to Panda were "devastating," as the Panda entities "now sell power into the grid ... at a fraction of the price they would have enjoyed had the false market data been accurate." As described above, Panda asserted claims for fraud, negligent misrepresentation, and breach of fiduciary duty. Specifically, according to Panda, (1) "[t]he ERCOT publications were made negligently or fraudulently" and/or ERCOT "negligently or fraudulently failed to disclose the falsity sooner than it did," and (2) ERCOT owed and breached "formal" and "informal" fiduciary duties to Panda "to act independently and competently in the performance of its responsibilities as an ISO."[2]
*302 ERCOT filed a general denial answer. Additionally, approximately one year later, ERCOT filed its jurisdictional plea based on exclusive jurisdiction described above. Following a response by Panda and a hearing, that plea to the jurisdiction was denied by the trial court.
Several months later, ERCOT filed a "Motion for Reconsideration of ERCOT's First Plea to the Jurisdiction and Alternative Amended Jurisdictional Plea." Therein, ERCOT contended in part that sovereign immunity bars Panda's claims because "an entity exercising the government's regulatory powers shares its immunity with respect to that exercise." In support of its arguments, ERCOT cited, inter alia , federal cases involving federal "self-regulatory organizations" ("SROs").
Panda filed a response in which it asserted in part "the law is clear that ERCOT is not the type of entity entitled to the protections of immunity because: (1) ERCOT is not a state agency or political subdivision of the state; (2) ERCOT does not perform state governmental functions; and (3) even if ERCOT was deemed to perform a governmental function, ERCOT has the sole discretion to determine the content in the CDRs and other representations." Further, Panda contended (1) because "ERCOT's CDR preparation and other representations do not involve quasi-judicial activities and are not regulatory," the SRO cases cited by ERCOT do not support immunity, and (2) "[e]ven if preparing CDRs is a 'regulatory' activity," it is "not the sort of regulation at issue" in those SRO cases.
At the hearing on the motion, ERCOT argued in part that it is designated to perform only "governmental functions," "performs no private functions," and is "not in any business other than doing what the PUC tells ERCOT to do." Further, ERCOT stated its plea to the jurisdiction on sovereign immunity is based "solely on the pleadings." The trial court denied ERCOT's motion for reconsideration and alternative plea to the jurisdiction. This consolidated interlocutory appeal and mandamus proceeding timely followed.[3]
II. ERCOT'S ISSUES
A. Applicable PURA Provisions and PUC Rules
Section 39.151 requires the PUC to "certify an independent organization or organizations" to perform the following functions:
(1) ensure access to the transmission and distribution systems for all buyers and sellers of electricity on nondiscriminatory terms;
(2) ensure the reliability and adequacy of the regional electrical network;
(3) ensure that information relating to a customer's choice of retail electric provider is conveyed in a timely manner to the persons who need that information; and
(4) ensure that electricity production and delivery are accurately accounted for among the generators and wholesale buyers and sellers in the region.
UTIL. § 39.151(a), (c). "Independent organization" means "an independent system operator or other person that is sufficiently independent of any producer or seller of electricity that its decisions will not be unduly influenced by any producer or seller." Id. § 39.151(b). Further, the PUC "shall adopt and enforce rules relating to the reliability of the regional electrical network *303 and accounting for the production and delivery of electricity among generators and all other market participants, or may delegate to an independent organization responsibilities for establishing or enforcing such rules." Id. § 39.151(d). Pursuant to section 39.151(d),
Any such rules adopted by an independent organization and any enforcement actions taken by the organization are subject to commission oversight and review. An independent organization certified by the commission is directly responsible and accountable to the commission. The commission has complete authority to oversee and investigate the organization's finances, budget, and operations as necessary to ensure the organization's accountability and to ensure that the organization adequately performs the organization's functions and duties.... The commission may take appropriate action against an organization that does not adequately perform the organization's functions or duties or does not comply with this section, including decertifying the organization or assessing an administrative penalty against the organization.
Id.
After approving the budget of the certified ISO,[4] the commission shall "authorize *304 the organization to charge to wholesale buyers and sellers a system administration fee, within a range determined by the commission, that is reasonable and competitively neutral to fund the independent organization's approved budget" and "require the organization to closely match actual revenues generated by the fee and other sources of revenue with revenue necessary to fund the budget, taking into account the effect of a fee change on market participants and consumers, to ensure that the budget year does not end with surplus or insufficient funds." Id. § 39.151(e).
Additionally, (1) to maintain certification under section 39.151, the ISO's governing body must be composed of persons specified by that section[5] and selected in accordance with formal bylaws or protocols of the organization that are approved by the PUC and "reflect the input of the commission," id. § 39.151(g); (2) the certified ISO "is subject to review under Chapter 325, Government Code (Texas Sunset Act), but is not abolished under that chapter," id. § 39.151(n); and (3) with limited exceptions,[6] meetings of the ISO's governing body or a subcommittee that includes a member of the governing body must be open to the public, see id. § 39.1511.
Among the rules adopted by the PUC regarding ERCOT's operations is section 25.505 of title 16 of the Texas Administrative Code, titled "Resource Adequacy in the Electric Reliability Council of Texas Power Region." 16 TEX. ADMIN. CODE § 25.505 (West, Westlaw through April 16, 2018). That section's stated purpose is "to prescribe mechanisms that [ERCOT] shall establish to provide for resource adequacy in the energy-only market design that applies to the ERCOT power region."[7] Id. § 25.505(a). Those mechanisms *305 "are intended to encourage market participants to build and maintain a mix of resources that sustain adequate supply of electric service in the ERCOT power region." Id. The provisions of section 25.505 require ERCOT to publish certain specified information.[8] Id. § 25.505(c)-(g). Further, administrative code section 25.362(i)(2) requires ERCOT to file an annual "operations report and plan" that contains, among other things, (1) "[a] summary of transmission planning and generation interconnection activities and the most recent report on capacity, demand and reserves"; (2) "[i]dentification of existing and potential transmission constraints, and the need for additional transmission, generation or demand response resources within the ERCOT region"; and (3) "projections of changes in demand, the capability of generation, energy storage, and demand response resources, projected reserve margins, alternatives for meeting system needs, and recommendations for meeting system needs." Id. § 25.362(i)(2). "The commission may initiate a review of the plan, at its discretion." Id. Additionally, section 25.361(b) of the administrative code states ERCOT shall, among other functions, (1) "administer, on a daily basis, the operational and market functions of the ERCOT system"; (2) "maintain the reliability and security of the ERCOT region's electrical network, including the instantaneous balancing of ERCOT generation and load and monitoring the adequacy of resources to meet demand"; and (3) "disseminate information relating to market operations, market prices, and the availability of services, in accordance with this chapter, [PUC] orders, and the ERCOT rules." Id. § 25.361(b).
B. This Court's Jurisdiction
1. Applicable Law
Subject matter jurisdiction "is essential to a court's power to decide a case" and "presents a question of law." City of Houston v. Rhule , 417 S.W.3d 440, 442 (Tex. 2013). All courts bear the affirmative obligation "to ascertain that subject matter jurisdiction exists regardless of whether the parties have questioned it." Id.
"Unless a statute authorizes an interlocutory appeal, appellate courts generally only have jurisdiction over final judgments." CMH Homes v. Perez , 340 S.W.3d 444, 447 (Tex. 2011). Section 51.014(a)(8) of the civil practice and remedies code authorizes an appeal from an order that "grants or denies a plea to the jurisdiction by a governmental unit as that term is defined in Section 101.001." CIV. PRAC. & REM. § 51.014(a)(8). In construing a statute, "[o]ur primary objective is to determine the Legislature's intent which, *306 when possible, we discern from the plain meaning of the words chosen." State v. Shumake , 199 S.W.3d 279, 284 (Tex. 2006). Further, we strictly construe section 51.014(a) as "a narrow exception to the general rule that only final judgments are appealable." Tex. A & M Univ. Sys. v. Koseoglu , 233 S.W.3d 835, 841 (Tex. 2007).
Section 101.001(3) of the civil practice and remedies code defines "governmental unit" as "(A) this state and all the several agencies of government that collectively constitute the government of this state, including other agencies bearing different designations, and all departments, bureaus, boards, commissions, offices, agencies, councils, and courts; (B) a political subdivision of this state ...; (C) an emergency service organization; and (D) any other institution, agency, or organ of government the status and authority of which are derived from the Constitution of Texas or from laws passed by the legislature under the constitution." CIV. PRAC. & REM. § 101.001(3).
2. Application of Law to Facts
As a threshold matter, we begin by addressing this Court's jurisdiction. ERCOT asserts that "because it implicates this Court's jurisdiction, the question of whether ERCOT is a governmental unit-and may thus take an interlocutory appeal-is one that this Court could-and perhaps must-examine on its own." ERCOT acknowledges that in a prior case in the Third District Court of Appeals in Austin, it specifically argued, and the court of appeals concluded, that it is not a governmental unit for purposes of an interlocutory appeal pursuant to section 51.014(a)(8). See HWY 3 MHP, LLC v. Elec. Reliability Council of Tex. , 462 S.W.3d 204, 212 (Tex. App.-Austin 2015, no pet.). However, ERCOT asserts that in a more recent case, University of the Incarnate Word v. Redus , 518 S.W.3d 905, 911 (Tex. 2017) (hereinafter " UIW "), the supreme court "held that an unambiguously private entity that performed a traditionally governmental function was a 'governmental unit' as to that function." According to ERCOT, "[ UIW 's ] novel functional approach to governmental-unit status may bear on how this Court views ERCOT, given its arguments that it performs a uniquely governmental function in regulating the electric grid and aspects of the electricity market."
Panda asserts that because ERCOT "is not" and "does not claim to be" a governmental unit for purposes of section 51.014(a)(8), this Court "should dismiss ERCOT's appeal and assess the issues presented under traditional mandamus standards alone."[9] Further, Panda argues UIW "did not change the law on how determinations [respecting section 101.001(3) ] are to be made," but rather "analyzed this issue just like the Austin Court did in HWY 3 ... and reached a different result on the specific facts of the entity before it."
In HWY 3 , ERCOT sued an electricity provider, HWY 3, for breach of contract. See 462 S.W.3d at 206. HWY 3 filed a breach of contract counterclaim against ERCOT. Id. In response, ERCOT filed a plea to the jurisdiction asserting the PUC had exclusive jurisdiction as to HWY 3's claim and HWY 3 had failed to exhaust its administrative remedies. Id. The trial court granted ERCOT's plea to the jurisdiction and HWY 3 filed an interlocutory appeal pursuant to section 51.014(a)(8). Id. On appeal, ERCOT argued in part that the *307 court of appeals lacked jurisdiction because ERCOT is not a "governmental unit" pursuant to section 101.001(3). Id. at 207.
In its analysis, the court of appeals cited LTTS Charter School, Inc. v. C2 Construction, Inc. , 342 S.W.3d 73 (Tex. 2011) (concluding open-enrollment charter school is "governmental unit" for purposes of section 51.014(a)(8) ). Specifically, the court of appeals stated in part,
Unquestionably, the statutory provisions relied on by HWY 3 demonstrate ERCOT has been delegated great authority and powers by the legislature and that it is a highly regulated entity. However, there are other circumstances in which the legislature exercises great regulatory oversight over organizations and also bestows power on them, but those organizations do not necessarily qualify as governmental units. Accordingly, when deciding whether ERCOT should be considered a governmental unit, we must also consider the other factors addressed by the supreme court in its analysis in LTTS Charter School .
HWY 3 , 462 S.W.3d at 209 (citations omitted). Then, the court of appeals reasoned as follows: (1) "the legislature's decision to designate an entity like ERCOT as an 'independent organization' rather than as an agency or by a similar title is some support for the idea that the legislature did not intend for ERCOT to be a governmental unit"; (2) while "charter schools operate parallel to and alternatively to governmental units," ERCOT "is not fulfilling the same role that a government agency is performing and has not been statutorily defined as being a part of a governmental unit"; (3) unlike a charter school, ERCOT "is not statutorily entitled to any services or benefits that a typical governmental unit might receive" and "does not receive funding from the State"; (4) although the PUC has "oversight over" ERCOT's budget, "this type of regulatory control is not dissimilar from the financial oversight that the legislature has exerted over utilities that are not considered governmental units"; (5) while various statutes "expressly equate[ ]" open-enrollment charter schools with governmental entities, a statutory provision allowing ERCOT to take advantage of computer-network security of a government agency "expressly states that the service is being offered to entities that are not state agencies, which is some indication that the legislature did not intend for ERCOT to qualify as a governmental unit"; and (6) although a provision of PURA requires ERCOT's meetings to "be open to the public," that provision "does not explicitly state that ERCOT is obligated to make its meetings public because it is a part of the government or expressly subject ERCOT to all of the requirements of the Open Meetings Act," nor does the Open Meetings Act "include independent organizations like ERCOT within its purview." Id. at 209-11. The court of appeals concluded "[f]or all of these reasons, particularly in light of the analysis from LTTS Charter School ," ERCOT is not a "governmental unit" for purposes of an interlocutory appeal under section 51.014(a)(8). Id. at 212.
UIW involved a lawsuit by the parents of a deceased student against a private university, UIW, arising out of the use of deadly force by the university's state-authorized police department. See 518 S.W.3d at 906. UIW asserted a plea to the jurisdiction based on governmental immunity, which was denied by the trial court. Id. UIW filed an interlocutory appeal pursuant to section 51.014(a)(8) in which it contended in part that although it "does not claim to be a governmental unit generally," it "is a governmental unit when defending the actions of its police department" because its "status and authority" to *308 "create a law enforcement agency or police department" arise from laws passed by the legislature that allow private universities to commission and deploy peace officers to enforce criminal laws. Id. at 906-07. The court of appeals disagreed and dismissed the appeal. Id. However, the supreme court reversed the court of appeals.
In the supreme court, UIW complained that the court of appeals "missed the mark" because it "focused on whether UIW is part of the public-education system instead of on whether UIW's police department is part of Texas's law-enforcement system." Id. at 908. The supreme court stated in part,
Our case law confirms that the question here is whether UIW's campus police department is part of a larger governmental system and provides a framework for answering that question. In LTTS Charter School , we concluded that a private charter school was an "institution, agency or organ of government" based on a legislative scheme that made private charter schools part of the Texas public-education system. Many of the same indicators of governmental-unit status present in LTTS Charter School are present here.
Id. at 910 (citations omitted). The supreme court reasoned (1) the legislature "granted charter schools all of the powers and privileges of public schools" and "here it has given UIW the power to operate a police department like that of any city"; (2) like a charter school, "UIW must follow the same state-promulgated rules its public counterparts follow"; (3) "like state and local law-enforcement agencies, UIW must make certain records available for public review because UIW's police department is a governmental entity under the Public Information Act"; and (4) although the legislature "has not granted private universities immunity from liability generally, as they did charter schools," the legislature "has granted limited immunity to private universities when their officers act pursuant to mutual assistance agreements with local police departments." Id. However, the supreme court observed, "the indicators of governmental-unit status present in LTTS Charter School do not precisely match those present here" because (1) unlike charter schools, "UIW lacks public funding"; (2) "the Legislature does not consider UIW a governmental entity under the Government Code and Local Government Code provisions relating to property held in trust and competitive bidding"; and (3) "the Legislature's intended role for private universities in public law enforcement is less clear than its express inclusion of open-enrollment charter schools in the public-school system." Id. Then, the supreme court concluded,
Nevertheless, the Legislature has authorized UIW to enforce state and local law using the same resource municipalities and the State use to enforce law: commissioned peace officers. UIW's officers have the same powers, privileges, and immunities as other peace officers. Because law enforcement is uniquely governmental, the function the Legislature has authorized UIW to perform and the way the Legislature has authorized UIW to perform it strongly indicate that UIW is a governmental unit as to that function.
Id. at 911 (citations omitted).[10]
In the case before us, ERCOT does not explain or describe how the analytical *309 framework applied in UIW differs from that in HWY 3 or would effect a different outcome than in HWY 3. Further, as described above, the analyses in UIW and HWY 3 were based on the same authority, i.e., LTTS Charter School , and show similar factors were considered in each case, including the "function" of the private entities in question. See HWY 3 , 462 S.W.3d at 210 (contrasting ERCOT with private entities in LTTS Charter School that "operate parallel to and alternatively to governmental units"). Based on the reasoning of HWY 3 , we conclude ERCOT is not a "governmental unit" for purposes of an interlocutory appeal pursuant to section 51.014(a)(8). See HWY 3 , 462 S.W.3d at 209-12 ; see also CIV. PRAC. & REM. § 51.014(a)(8). Consequently, this Court does not have jurisdiction over ERCOT's interlocutory appeal. See CMH Homes , 340 S.W.3d at 447. We dismiss ERCOT's interlocutory appeal for lack of jurisdiction.
C. Mandamus Review of ERCOT's Plea to the Jurisdiction
1. Standard of Review
Mandamus is "an extraordinary remedy, not issued as a matter of right, but at the discretion of the court." In re Prudential Ins. Co. of Am. , 148 S.W.3d 124, 138 (Tex. 2004) (orig. proceeding). Intermediate appellate courts in Texas have authority to issue writs of mandamus "agreeable to the principles of law regulating those writs" against district court judges in the appellate courts' respective districts. GOV'T § 22.221(b). In cases where an interlocutory appeal is available, mandamus relief is generally not appropriate. See In re McAllen Med. Ctr., Inc. , 275 S.W.3d 458, 474 (Tex. 2008) (orig. proceeding).
To be entitled to mandamus relief, a relator must show both that the trial court clearly abused its discretion and that relator has no adequate appellate remedy. Prudential , 148 S.W.3d at 135-36. A trial court abuses its discretion when it fails to analyze or apply the law correctly. See, e.g. , In re Columbia Med. Ctr. of Las Colinas , 306 S.W.3d 246, 248 (Tex. 2010) (orig. proceeding). "This principle applies even when the law is unsettled." In re J.B. Hunt Transport, Inc. , 492 S.W.3d 287, 294 (Tex. 2016) (orig. proceeding).
A plea to the jurisdiction challenges the trial court's authority to determine the subject matter of a specific cause of action. Bland Indep. Sch. Dist. v. Blue , 34 S.W.3d 547, 554 (Tex. 2000). Whether a trial court has subject matter jurisdiction is a question of law and is reviewed de novo. Tex. Dep't of Parks & Wildlife v. Miranda , 133 S.W.3d 217, 226 (Tex. 2004). In performing this review, an appellate court does not look to the merits of the case, but considers only the pleadings and evidence relevant to the jurisdictional inquiry. Blue , 34 S.W.3d at 554-55.
2. Applicable Law
"Sovereign immunity implicates a trial court's jurisdiction, and, when it applies, precludes suit against a governmental entity." Patel v. Tex. Dep't of Licensing & Regulation , 469 S.W.3d 69, 75 (Tex. 2015). The justification for the doctrine of sovereign immunity has evolved from the "feudal fiction that [t]he King can do no *310 wrong" to "accord[ing] States the dignity that is consistent with their status as sovereign entities" to "protect[ing] the public treasury." Wasson Interests, Ltd. v. City of Jacksonville , 489 S.W.3d 427, 431-32 (Tex. 2016). "Regardless of which justification is most compelling, however, it is firmly established that 'an important purpose [of sovereign immunity] is pragmatic: to shield the public from the costs and consequences of improvident actions of their governments.' " Id. at 432 (quoting Tooke v. City of Mexia , 197 S.W.3d 325, 332 (Tex. 2006) ); see also Brown & Gay Eng'g, Inc. v. Olivares , 461 S.W.3d 117, 121 (Tex. 2015) (doctrine of sovereign immunity "protects the public as a whole by preventing potential disruptions of key government services that could occur when government funds are unexpectedly and substantially diverted by litigation" and "preserves separation-of-powers principles" by "recogniz[ing] that the Legislature has the responsibility to determine how these public funds will be spent").
"Sovereign immunity is a common-law creation and 'it remains the judiciary's responsibility to define the boundaries of the ... doctrine and to determine under what circumstances sovereign immunity exists in the first instance.' " Brown & Gay , 461 S.W.3d at 122 (quoting Reata Constr. Corp. v. City of Dallas , 197 S.W.3d 371, 375 (Tex. 2006) ). "To determine whether an entity is immune, courts should rely not on [ civil practice and remedies code section 101.001(3) 's] definition of governmental unit, ... but on the 'nature and purposes' of sovereign immunity." UIW , 518 S.W.3d at 911 (citing Wasson , 489 S.W.3d at 432 ). "In short, whether an entity is entitled to an interlocutory appeal and whether an entity has sovereign immunity are separate questions with separate analytical frameworks." Id.
3. Application of Law to Facts
We begin with ERCOT's second issue, in which it contends the trial court abused its discretion by denying ERCOT's alternative amended plea to the jurisdiction because "ERCOT, which oversees the operation of the electric transmission network and administers the wholesale electricity market pursuant to grants of power from the Legislature and PUC, [has] sovereign immunity from suits when it exercises those delegated powers." According to ERCOT, (1) it is "a quasi-governmental regulator, performing an essential public service"; (2) "[i]n highly analogous circumstances, federal courts have confirmed the immunity of quasi-governmental regulatory authorities"; (3) "sovereign immunity's justifications apply to ERCOT"; and (4) although the supreme court held in Brown & Gay that "independent contractors generally lack sovereign immunity where they exercise discretion over the work they perform," that rule does not apply to ERCOT because it is not an independent contractor.
Panda responds in part that "a non-governmental, non-profit corporation that receives no taxpayer dollars and retains discretion over its day-to-day operations" should not enjoy sovereign immunity. Specifically, according to Panda, (1) Brown & Gay established "the controlling standard" for "the limited circumstances in which the State's immunity extends to a private company like ERCOT"; (2) pursuant to Brown & Gay , "the State's immunity does not extend to private companies exercising independent discretion"; (3) because "there is no dispute here that ERCOT was exercising discretion when it misrepresented the state of electricity markets," the trial court properly rejected ERCOT's immunity position; (4) "ERCOT's doctrinal arguments do not justify extending immunity here," but rather "point the other way"; (5)
*311 the SRO cases cited by ERCOT are "irrelevant and inapposite" because those cases "arise from the uniquely federal 'absolute immunity' doctrine, which has no bearing on sovereign immunity under Texas law"; and (6) even if federal absolute immunity were relevant, this case "does not arise from the exercise of a function that would be protected by absolute immunity."
In its reply brief in this Court, ERCOT asserts in part (1) the Texas Legislature "created the ISO role as a key regulatory component of the restructured electrical market"; (2) "ERCOT underwent a number of financial, organizational, structural, and functional changes because of its appointment as ISO"; (3) "unlike any other corporation in Texas, [ERCOT] exclusively performs statutory functions," among which are "mak[ing] binding rules that have the force of statute"; (4) Brown & Gay 's holding does not govern this case because ERCOT is not an independent contractor, but rather "acts as the government" (emphasis original); (5) "ERCOT's analogy to SRO immunity is apt because the logic, legal principles, and governmental purposes favoring protection of federal SROs apply equally to ERCOT"; and (6) ERCOT's publication of the CDRs furthers ERCOT's "regulatory mission" and therefore is protected by SRO immunity.
Following oral submission before this Court, both sides filed post-submission letter briefs. Therein, ERCOT contends in part (1) "ERCOT's role is defined not by a contract with the State of Texas, but by a statute that lays out, in meticulous detail, ERCOT's responsibilities and powers" (emphasis original); (2) "[a]s Panda's counsel admitted at argument, ERCOT is authorized to perform no functions other than those given it by the Legislature and PUC"; and (3) ERCOT "exclusively performs governmental, regulatory functions" (emphasis original). Panda asserts in part (1) " HWY 3 forecloses any suggestion that ERCOT is entitled to the immunity that is sometimes enjoyed by governmental units-because it is not even that"; (2) "[a]s a result, the immunity inquiry is controlled by Brown & Gay "; and (3) "[t]hat ERCOT's general responsibilities arise from a statute does not the change the analysis."
In Brown & Gay , a private engineering firm, Brown & Gay, contracted with a governmental unit, the Fort Bend County Toll Road Authority, to design and construct a roadway. See 461 S.W.3d at 119. Under the contract, the Authority delegated the responsibility of designing road signs and traffic layouts to Brown & Gay, subject to approval by the Authority's board of directors. Id. Brown & Gay was contractually responsible for furnishing the necessary equipment and personnel to perform its duties and was required to maintain insurance for the project. Id. Subsequently, relatives of a motorist killed while driving on the roadway sued Brown & Gay for negligence in carrying out its responsibilities in the design and installation of signs and other traffic-control devices. Id. Brown & Gay filed a plea to the jurisdiction seeking the same sovereign immunity protection the governmental unit would enjoy had it performed the work itself. Id. The trial court granted the plea, but the court of appeals reversed, holding the firm was not immune from suit. Id. The supreme court affirmed the court of appeals's judgment. Id.
In its analysis, the supreme court observed that the benefits of sovereign immunity come with "a significant cost," i.e., "in shield[ing] the public from the costs and consequences of improvident actions of their governments, sovereign immunity places the burden of shouldering those costs and consequences on injured individuals." Id. at 121-22. Then, that court addressed *312 the parties' arguments in light of the doctrine's underlying purposes. Id. at 123-30.
First, as to "the general purpose of protecting the public fisc," Brown & Gay argued that while its exposure to defense costs and a money judgment would not affect the project's cost to the government, "the increased costs generally associated with contractors' litigation exposure will be passed on to the government, resulting in higher contract prices and government expense." Id. at 123. In rejecting that argument, the supreme court stated that Brown & Gay "ignores the many factors at play within the highly competitive world of government-contract bidding" and "disregards the fact that private companies can and do manage their risk exposure by obtaining insurance, as Brown & Gay did in this case." Id. Further, that court reasoned in part,
Sovereign immunity has never been defended as a mechanism to avoid any and all increases in public expenditures. Rather, it was designed to guard against the "unforeseen expenditures" associated with the governments defending lawsuits and paying judgments "that could hamper government functions" by diverting funds from their allocated purposes. Immunizing a private contractor in no way furthers this rationale. Even if holding a private party liable for its own improvident actions in performing a government contract indirectly leads to higher overall costs to government entities in engaging private contractors, those costs will be reflected in the negotiated contract price. This allows the government to plan spending on the project with reasonable accuracy.
By contrast, ... the costs associated with a potential lawsuit cannot be anticipated at the project's outset. Litigation against the government therefore disrupts the government's allocation of funds on the back end, when the only option may be to divert money previously earmarked for another purpose. It is this diversion-and the associated risk of disrupting government services-that sovereign immunity addresses.
Id. at 123-24 (citations omitted).
Next, the supreme court addressed the "government's right to control" as a factor in the extension of immunity to private companies. Id. at 124. That court observed that in a prior case involving a private company that contracted with a Kansas governmental entity, it stated,
While sovereign immunity protects the activities of government entities, no sovereign is entitled to extend that protection ad infinitum through nothing more than private contracts. [The private entity] is not entitled to sovereign immunity unless it can demonstrate its actions were actions of the Kansas government, executed subject to the control of [the system].
Id. (quoting K.D.F. v. Rex , 878 S.W.2d 589, 597 (Tex. 1994) ). Further, the supreme court stated that "[i]n turn, we held that another private company that 'operate[d] solely upon the direction of [the system]' and 'exercise[d] no discretion in its activities' was indistinguishable from the system, such that 'a lawsuit against one [wa]s a lawsuit against the other.' " Id. (quoting K.D.F. , 878 S.W.2d at 597 ). Then, the supreme court observed that as to Brown & Gay, the government's "right to control" is "utterly absent here." That court concluded, "We need not establish today whether some degree of control by the government would extend its immunity protection to a private party; we hold only that no control is determinative." Id. at 126.
Additionally, the supreme court rejected arguments by Brown & Gay that (1) "justifications for qualified and official immunity"
*313 support the extension of sovereign immunity to government contractors and (2) "declining to extend sovereign immunity to contractors like Brown & Gay will make it difficult for the government to engage talented private parties fearful of personal liability." Id. at 128-29. As to the first of those arguments, the supreme court stated (1) qualified immunity is a federal doctrine that is similar to the Texas common-law defense of official immunity; (2) official immunity is an affirmative defense that must be pled and proved by the party asserting it; (3) Brown & Gay has not "pled or argued that the elements of the defense are satisfied here," but rather "[i]nstead argues it is entitled to the same immunity the government itself enjoys"; and (4) "the policies underlying official and qualified immunity are simply irrelevant to that contention." Id. Further, the supreme court stated Brown & Gay's second argument "ignores the countervailing considerations that make contracting with the government attractive, not the least of which is lack of concern about the government's ability to pay." Id. at 129. Then, the supreme court concluded, "We decline to extend sovereign immunity to private contractors based solely on the nature of the contractors' work when the very rationale for the doctrine provides no support for doing so."[11] Id.
In the case before us, Panda argues Brown & Gay "establishes the analytical framework for assessing a private entity's immunity claims," regardless of whether the private entity is a government contractor. According to Panda, (1) there is no basis for restricting the holding in Brown & Gay to private contractors and (2) the opinion "speaks in far broader terms."
ERCOT asserts Brown & Gay is inapplicable in this case because (1) unlike this case, Brown & Gay "was concerned with a contractual relationship between a company and the government"; (2) the supreme court "never held that its rule regarding discretion applied outside the context of independent contractors"; and (3) unlike an independent contractor, ERCOT conducts no business other than the functions it performs "at the legislature's and PUC's behest" and does not market its services to any other use.
Although the supreme court's opinion in Brown & Gay is silent as to whether it is limited to independent contractors, the analysis and rationale of the opinion are based primarily on the specific context of government contracting. For example, as described above, the supreme court stated (1) Brown & Gay's argument respecting the "public fisc" "ignores the many factors at play within the highly competitive world of government-contract bidding" and (2) "[e]ven if holding a private party liable for its own improvident actions in performing a government contract indirectly leads to higher overall costs to government entities in engaging private contractors, those costs will be reflected in the negotiated contract price," which "allows the government to plan spending on the project with reasonable accuracy." Id. at 123. Further, the statements from K.D.F . relied upon by the supreme court pertained to the question of whether a sovereign is entitled to extend immunity protection "ad infinitum through nothing more than private contracts." Id. at 124 (quoting K.D.F. , 878 S.W.2d at 597 ). Additionally, (1) as to Brown & Gay's argument that declining to *314 extend sovereign immunity would make it difficult for the government to engage talented private parties, the supreme court stated that argument "ignores the countervailing considerations that make contracting with the government attractive, not the least of which is lack of concern about the government's ability to pay," and (2) the supreme court's conclusion was stated as follows: "We decline to extend sovereign immunity to private contractors based solely on the nature of the contractors' work when the very rationale for the doctrine provides no support for doing so." Id. at 129.
By contrast, in the case before us, considerations respecting competitive government-contract bidding, negotiation of a contract price, and the financial appeal of contracting with the government versus a private entity are not relevant. Further, rather than involving "nothing more than private contracts," the case before us involves an entity that exclusively performs functions assigned by the legislature and the PUC and does not market its services to any other use. Because the considerations underlying the analysis and rationale of Brown & Gay are inapplicable to ERCOT, we conclude Brown & Gay does not preclude immunity in this case.
As described above, to determine whether an entity is immune, courts should rely on "the 'nature and purposes' of sovereign immunity." UIW , 518 S.W.3d at 911 (citing Wasson , 489 S.W.3d at 432 ); see also ids="6799983" index="67" url="https://cite.case.law/sw3d/489/427/#p431">id. (whether an entity is entitled to sovereign immunity and whether an entity is a "governmental unit" for purposes of an interlocutory appeal "are separate questions with separate analytical frameworks"). In its consolidated brief in this Court, ERCOT asserts in part,
The Supreme Court has recognized three bases for sovereign immunity, each of which applies to ERCOT. First, immunity protects the public fisc. ERCOT is funded by a Fee that is authorized by the Legislature pursuant to its police power and paid, ultimately, by electricity consumers. Second, separation-of-powers requires ERCOT's immunity. The Legislature has decreed that the PUC, not the courts, decides when and how much money ERCOT spends, how it operates, and whether it has underperformed or abused its power. Third, immunity would protect critical government services. Public policy and economic necessity demand that the Texas electric grid continue to function; the PUC appointed ERCOT as the operator of this grid. Money that has been designated for these essential regulatory purposes, if diverted to pay private litigants, would defeat the Legislature's mission to protect the electric market and its consumers.
Panda contends the nature and purposes of immunity "do not justify creating a new exception for ERCOT." Specifically, according to Panda, (1) ERCOT "does not receive any funding from the State" and therefore "state funds are not implicated by this lawsuit" (emphasis original); (2) "ERCOT's separation of powers argument fails for the same reasons" because "[t]o the extent this principle is relevant to immunity, the focus is on 'the Legislature's prerogative to allocate tax dollars' " (quoting Brown & Gay , 461 S.W.3d at 121 ); and (3) "a judgment against ERCOT will not hamper any government function" because "ERCOT would simply have an obligation to pay whatever amount is not covered by insurance, like any other judgment debtor," and "in the most extreme scenario, the PUC would simply decertify ERCOT, appoint a new ISO, and oversee the efficient transfer of responsibilities."
As stated by the supreme court, the doctrine of sovereign immunity "protects *315 the public as a whole by preventing potential disruptions of key government services that could occur when government funds are unexpectedly and substantially diverted by litigation" and "preserves separation-of-powers principles" by "recogniz[ing] that the Legislature has the responsibility to determine how these public funds will be spent." Brown & Gay , 461 S.W.3d at 121. Section 39.151(e) requires the PUC to "authorize the organization to charge to wholesale buyers and sellers a system administration fee, within a range determined by the commission, that is reasonable and competitively neutral to fund the independent organization's approved budget." UTIL. § 39.151(e). Although not a "tax," the system administration fee is authorized by statute, set by the PUC, collected pursuant to the State's power, and intended to further a function for the benefit of the public. See id. Therefore, to the extent Panda contends this case does not present fiscal implications pertinent to the sovereign immunity analysis, we disagree. See id. ; see also Tooke , 197 S.W.3d at 332 (stating sovereign immunity's purpose is "to shield the public from the costs and consequences of improvident actions of their governments"). Additionally, as to separation-of-powers principles, section 39.151 shows the legislature intended that determinations respecting system administration fees and ERCOT's fiscal matters, as well as any potential disciplinary matters or decertification, should be made by the PUC rather than the courts. UTIL. § 39.151(d) - (e). Further, as the certified ISO provided for in section 39.151, ERCOT is a necessary component of the legislature's electric utility industry regulatory scheme. See id. § 39.151(a). A substantial judgment in this case could necessitate a potentially disruptive diversion of ERCOT's resources or a decertification of ERCOT not otherwise intended by the PUC. See Brown & Gay , 461 S.W.3d at 124 (sovereign immunity is intended to address diversion of funds allocated by government "and the associated risk of disrupting government services"). Therefore, extending sovereign immunity to ERCOT in this case would serve that doctrine's nature and purposes. See UIW , 518 S.W.3d at 911.
Additionally, the extension of sovereign immunity in this case is consistent with the underlying principles and reasoning of federal cases involving SROs. Under federal law, SROs are certain private organizations authorized by Congress to "promulgate and enforce rules" governing their members. See DL Capital Grp., LLC v. Nasdaq Stock Mkt., Inc. , 409 F.3d 93, 95 (2d Cir. 2005) ; see also S.C. Pub. Serv. Auth. v. Fed. Energy Regulatory Comm'n , 762 F.3d 41, 51 (D.C. Cir. 2014) (describing North American Electric Reliability Corporation as "the [electric] industry's self-regulatory organization" pursuant to the Federal Power Act). SROs have been described as "quasi-governmental" authorities. DL Capital , 409 F.3d at 95.
Since the 1930s, U.S. securities dealers have been subject to regulation by SROs registered with the U.S. Securities Exchange Commission, including, among others, the New York Stock Exchange, Inc. ("NYSE"), the National Association of Securities Dealers, Inc. ("NASD"), and the NASDAQ Stock Market, Inc. ("NASDAQ"). See Standard Inv. Chartered, Inc. v. NASD , 637 F.3d 112, 114 (2d Cir. 2011) ; DL Capital , 409 F.3d at 95. Such SROs have been described as "a key part of the interrelated and comprehensive mechanism for regulating securities markets, including market participants." Charles Schwab & Co. Inc. v. Fin. Indus. Regulatory Auth. Inc. , 861 F.Supp.2d 1063, 1065 (N.D. Cal. 2012). "Because they perform a variety of vital governmental functions, but *316 lack the sovereign immunity that governmental agencies enjoy, SROs are protected by absolute immunity when they perform their statutorily delegated adjudicatory, regulatory, and prosecutorial functions." Weissman v. NASD , 500 F.3d 1293, 1296 (11th Cir. 2007). "This immunity extends both to affirmative acts as well as to an SRO's omissions or failure to act." Standard Inv. , 637 F.3d at 115. The SEC has "extensive involvement with, and broad oversight of," the SROs registered with it. DL Capital , 409 F.3d at 95 (citing 15 U.S.C. § 78s ). "[I]f an SRO has violated, or is unable to comply with, inter alia , the provisions of the [Securities Exchange Act], its own rules, or the rules of the SEC, the SEC is authorized to suspend or even revoke an SRO's registration." Id.
Federal courts have reasoned that because securities-industry SROs "perform[ ] a variety of functions that would, in other circumstances, be performed by a government agency," yet do not "share in the SEC's sovereign immunity," affording those SROs absolute immunity is appropriate when the relevant conduct constitutes a delegated quasi-governmental prosecutorial, regulatory, or disciplinary function. See D'Alessio v. NYSE , 258 F.3d 93, 105 (2d Cir. 2001) ; see also Barbara v. NYSE , 99 F.3d 49, 59 (2d Cir. 1996) (stating that allowing plaintiff's lawsuit against SRO "would clearly stand as an obstacle to the accomplishment and execution of the full purposes and objective of Congress"), abrogated in part on other grounds by Merrill Lynch, Pierce, Fenner & Smith Inc. v. Manning , --- U.S. ----, 136 S.Ct. 1562, 194 L.Ed.2d 671 (2016). Further, the Second Circuit has stated, "There is no question that an SRO and its officers are entitled to absolute immunity from private damages suits in connection with the discharge of their regulatory responsibilities." Standard Inv. , 637 F.3d at 115. Specifically, in Standard Investment , the Second Circuit concluded SRO immunity barred a lawsuit based on alleged misstatements by NASD in a proxy solicitation pertaining to amendments to its bylaws required pursuant to its consolidation with another SRO. Id. That court stated in part (1) the proxy solicitation, which was the only vehicle available to NASD for amending its bylaws, was "incident to the exercise of regulatory power," i.e., the consolidation, and "therefore an activity to which immunity attached," ids="4198154" index="90" url="https://cite.case.law/f3d/637/112/#p114">id. at 116, and (2) "[t]he statutory and regulatory framework highlights to us the extent to which an SRO's bylaws are intimately intertwined with the regulatory powers delegated to SROs by the SEC and underscore our conviction that immunity attaches to the proxy solicitation here," ids="4198154" index="91" url="https://cite.case.law/f3d/637/112/#p114">id. at 116-17.
Similarly, in DL Capital , an investor sued NASDAQ based on the timing of NASDAQ's announcement of its decision to cancel certain stock market trades. See 409 F.3d at 98. The investor contended SRO immunity was inapplicable because it was "challenging not NASDAQ's regulatory decisions ..., but rather the manner in which NASDAQ publicly announced those decisions." Id. The Second Circuit rejected that position, reasoning in part that "[w]ithout the capacity to make announcements, defendants would be stripped of a critical and necessary part of their regulatory powers." Id. ; see also In re NYSE Specialists Sec. Litig. , 503 F.3d 89, 100 (2d Cir. 2007) (affording SRO immunity where, "[w]hile these actions may not appear to form the heart of the regulatory functions delegated to the NYSE as an SRO, they are nonetheless central to effectuating the NYSE's regulatory decision making").
Additionally, the Second Circuit has specifically declined to carve out a fraud exception to SRO immunity. See DL Capital , 409 F.3d at 99 ("rejecting a fraud exception is a matter not simply of logic but of *317 intense practicality since [otherwise] the [SRO's] exercise of its quasi-governmental functions would be unduly hampered by disruptive and recriminatory lawsuits"). That court has observed that alternative means of redressing a security-industry SRO's wrongful conduct include "the formidable oversight power" of the SEC granted by Congress. NYSE Specialists , 503 F.3d at 101.
In the case before us, ERCOT asserts (1) "[SROs'] functions parallel ERCOT's very closely" and therefore the SRO immunity cases are "highly persuasive"; (2) any "doctrinal distinction" between sovereign immunity and SRO immunity should matter less than the SRO cases' "logical underpinnings"; (3) although most cases respecting SRO immunity arise in the context of the securities industry, those cases "are based not on securities principles of limited applicability, but on the fact that Congress has chosen to use a corporation certified by an agency, rather than that agency directly, to perform its regulatory mission"; and (4) "ERCOT's CDRs-the subject of Panda's suit-are more than incidentally connected to the performance of its regulatory duties."
Panda contends (1) "[b]ecause of the differing policies underlying these doctrines, absolute immunity cases provide no justification for extending Texas's sovereign immunity"; (2) the supreme court stated in Brown & Gay that "the policies underlying official and qualified immunity" were "irrelevant" to the private contractor's contention that it was entitled to sovereign immunity; (3) like the supreme court in Brown & Gay , this Court should "decline to apply an inapposite federal immunity doctrine to a state-law sovereign immunity problem"; (4) this Court "should not engraft a federal law exception onto settled Texas immunity law because ERCOT's cited authorities have only ever been applied to federal securities regulators"; (5) even if federal absolute immunity were relevant, "the CDRs do not 'regulate' the activities of market participants," but rather "simply disseminate information on supply and demand," and therefore "are not the kind of regulatory conduct that triggers absolute immunity"; and (6) "in any event, the allegations in this case are broader than just the CDRs" and include "misrepresentations made by ERCOT in public reports, presentations, and direct conversations."
To the extent Panda contends Brown & Gay precludes this Court's consideration of SRO immunity cases, we disagree. As described above, the supreme court's statement in Brown & Gay that the "policies underlying official and qualified immunity" were "irrelevant" to the private contractor's contention that it was entitled to sovereign immunity was immediately preceded by that court's observation that the contractor had not pled the affirmative defense of official immunity or argued the elements were satisfied, thus suggesting lack of pleading and proof as a basis for the irrelevance of the defense's underlying policies. See 461 S.W.3d at 128-29. Moreover, as also described above, the analysis and rationale of Brown & Gay were based primarily on considerations relevant to independent contractors that are not implicated in the case before us. See ids="6865844" index="99" url="https://cite.case.law/sw3d/461/117/#p121">id. at 123-29.
Further, we do not agree with Panda's position that the SRO immunity cases described above are "inapposite." Regardless of whether absolute immunity developed from the same doctrinal roots underlying official and qualified immunity, the Second Circuit's application of SRO immunity in Barbara described one of the same purposes considered by Texas courts in determining sovereign immunity. See Barbara , 99 F.3d at 59 (stating that allowing plaintiff's *318 lawsuit against SRO "would clearly stand as an obstacle to the accomplishment and execution of the full purposes and objective of Congress"). Also, while federal case law dealing with SRO immunity appears to be limited to cases involving federal securities regulators, (1) the term "self-regulatory organization" is not limited to that context, see S.C.Pub. Serv. Auth. , 762 F.3d at 51 (describing North American Electric Reliability Corporation as "the [electric] industry's self-regulatory organization"), and (2) the securities SRO cases described above are analogous to the case before us in that they involve a legislative scheme under which private corporations are certified by an agency to perform its regulatory mission. Like the SROs in those cases, (1) ERCOT is a private corporation exercising power delegated to it by an administrative agency pursuant to legislation; (2) ERCOT's power includes rulemaking authority that is binding on market participants; and (3) ERCOT is subject to broad oversight by the PUC, which can decertify it. Based on the reasoning of the SRO immunity cases described above and the "nature and purposes" of sovereign immunity, we conclude ERCOT is entitled to sovereign immunity from private damages suits in connection with the discharge of its regulatory responsibilities. See UIW , 518 S.W.3d at 911; Standard Inv. , 637 F.3d at 115 ; see also Brown & Gay , 461 S.W.3d at 129 (Hecht, C.J., concurring) ("An independent contractor may act as the government, in effect becoming the government for limited purposes, and when it does, it should be entitled to the government's immunity.").
In light of that conclusion, we turn to the parties' arguments respecting whether the sovereign immunity extended to ERCOT bars this particular lawsuit. First, as described above, Panda contends "the allegations in this case are broader than just the CDRs" and include "misrepresentations made by ERCOT in public reports, presentations, and direct conversations." However, Panda cites no portion of its live pleading, and we have found none, complaining of alleged "misrepresentations made by ERCOT in public reports, presentations, and direct conversations" pertaining to matters other than the CDRs and the market data contained therein. Next, Panda argues the CDRs "simply disseminate information on supply and demand" and therefore "are not the kind of regulatory conduct that triggers absolute immunity." In support of that argument, Panda cites two SRO cases in which immunity was afforded as to the conducting of disciplinary proceedings. See Barbara , 99 F.3d at 58-59 ; Austin Mun. Sec., Inc. v. NASD , 757 F.2d 676, 688 (5th Cir. 1985). However, nothing in those cases limits immunity solely to such functions. Moreover, in Standard Investment , the Second Circuit (1) stated "an SRO and its officers are entitled to absolute immunity from private damages suits in connection with the discharge of their regulatory responsibilities " and (2) afforded SRO immunity for a proxy solicitation "incident to the exercise of regulatory power. " Standard Inv. , 637 F.3d at 116-17 (emphasis added); see also NYSE Specialists , 503 F.3d at 100 (affording SRO immunity where, "[w]hile these actions may not appear to form the heart of the regulatory functions delegated to the NYSE as an SRO, they are nonetheless central to effectuating the NYSE's regulatory decision making"); DL Capital , 409 F.3d at 98 (affording SRO immunity for suit based on timing of NASDAQ's announcement of its decision to cancel certain trades because "[w]ithout the capacity to make announcements, defendants would be stripped of a critical and necessary part of their regulatory powers").
In its reply brief in this Court, ERCOT asserts in part,
*319 [T]he CDRs need not directly "regulate" a market participant to be regulatory. Among ERCOT's regulatory functions is ensuring grid adequacy and reliability. Because of Texas's energy-only market, ensuring sufficient generation capacity through investment is essential to ERCOT's regulatory mission. ERCOT is required to publish CDRs precisely because the State needs a reliable electric market, a vital component of its economic and public health. Because ERCOT publishes CDRs to further its regulatory mission of ensuring grid adequacy and reliability, its actions are protected by SRO immunity.
As described above, as the ISO certified by the PUC under Chapter 39, ERCOT is to perform functions that include "ensur[ing] the reliability and adequacy of the regional electrical network." UTIL. § 39.151(a). Rules adopted by the PUC require ERCOT to establish "mechanisms" to "provide for resource adequacy" in an energy-only market, which mechanisms "are intended to encourage market participants to build and maintain a mix of resources that sustain adequate supply of electric service in the ERCOT power region." 16 ADMIN. § 25.505(a). Specifically, ERCOT is required to publish certain reports, including the CDRs. Id. §§ 25.505, 25.362(i)(2).
Based on the statutes and rules described above, we conclude (1) ERCOT's regulatory responsibilities include ensuring the reliability and adequacy of the regional electrical network and (2) ERCOT's publication of the CDRs was "in connection with the discharge of" those regulatory responsibilities. See UTIL. § 39.151(a) ; 16 ADMIN. §§ 25.505, 25.362 ; Standard Inv. , 637 F.3d at 116-17. Therefore, ERCOT's complained of actions are protected by immunity. See Standard Inv., 637 F.3d at 116-17 ; see also NYSE Specialists , 503 F.3d at 100 ; DL Capital , 409 F.3d at 98. Consequently, the trial court's denial of ERCOT's plea to the jurisdiction based on sovereign immunity constituted an abuse of discretion. See Columbia Med. Ctr. , 306 S.W.3d at 248.
Because ERCOT has established the first element required for mandamus relief, see Prudential , 148 S.W.3d at 135-36, we now proceed to the second element, lack of adequate remedy by appeal. See ids="9146465" index="117" url="https://cite.case.law/sw3d/148/124/#p138">id. The supreme court has stated,
The operative word, "adequate", has no comprehensive definition; it is simply a proxy for the careful balance of jurisprudential considerations that determine when appellate courts will use original mandamus proceedings to review the actions of lower courts. These considerations implicate both public and private interests.... Mandamus review of significant rulings in exceptional cases may be essential to preserve important substantive and procedural rights from impairment or loss ... and spare private parties and the public the time and money utterly wasted enduring eventual reversal of improperly conducted proceedings. An appellate remedy is "adequate" when any benefits to mandamus review are outweighed by the detriments. When the benefits outweigh the detriments, appellate courts must consider whether the appellate remedy is adequate.
Id. at 136. "Incidental district court rulings, which include pleas to the jurisdiction, generally will not be reviewed by mandamus because an adequate appellate remedy exists." In re State Bar of Tex. , 113 S.W.3d 730, 734 (Tex. 2003) (orig. proceeding). However, exceptions have been recognized. See, e.g. , In re SWEPI, L.P. , 85 S.W.3d 800, 808 (Tex. 2002) (orig. proceeding) (when one court renders order that directly interferes with another court's jurisdiction, appellate relief is inadequate);
*320 In re Entergy Corp. , 142 S.W.3d 316, 321-22 (Tex. 2004) (orig. proceeding) (applying exception where PUC had exclusive jurisdiction). "[W]hether an appellate remedy is 'adequate' so as to preclude mandamus review depends heavily on the circumstances presented and is better guided by general principles than by simple rules." Prudential , 148 S.W.3d at 137.
In its consolidated brief in this Court, ERCOT asserts (1) "by virtue of its immunity, [it] has a substantive right not to be subjected to discovery or hauled into court for trial"; (2) "[i]n the absence of mandamus relief, this substantive right would be nullified"; (3) "[g]ranting mandamus to protect ERCOT's sovereign immunity would also be consistent with the [Texas Supreme Court's] frequent use of mandamus relief to correct trial court actions 'that exceed[ ] its jurisdictional authority' "; and (4) the resulting "waste" and "damage done to governmental processes" cannot be corrected by delayed appellate review. Panda does not specifically address the mandamus element of lack of adequate remedy by appeal.
This case does not fit squarely within the above-described exceptions to the rule that pleas to the jurisdiction generally will not be reviewed by mandamus. However, the determination as to the adequacy of an appellate remedy "is better guided by general principles." Id. Allowing mandamus review in this case would prevent "impairment or loss" of ERCOT's important substantive right to sovereign immunity. See ids="9146465" index="124" url="https://cite.case.law/sw3d/148/124/#p138">id. at 136 ; see also City of Houston v. Williams , 216 S.W.3d 827, 829 (Tex. 2007) ("governmental immunity does not spring into existence when a damages award is finally made; it shields governments from the costs of any litigation leading up to that goal"). Additionally, this case presents an extraordinary circumstance in that the resources implicated include revenue from fees authorized and established by the government respecting an essential service. See UTIL. § 39.151(e). Therefore, we conclude (1) this is an "exceptional" case in which mandamus review is "essential to preserve important substantive ... rights from impairment or loss ... and spare private parties and the public the time and money utterly wasted enduring eventual reversal of improperly conducted proceedings"; (2) the benefits to mandamus review in this case outweigh the detriments; and (3) ERCOT lacks an adequate appellate remedy. See Prudential , 148 S.W.3d at 136 ; see also In re Team Rocket , 256 S.W.3d 257, 262 (Tex. 2008) (orig. proceeding) (mandamus can be warranted to avoid subjecting taxpayers, defendants, and courts to "meaningless proceedings and trials").
III. CONCLUSION
For the reasons described above, we (1) dismiss ERCOT's interlocutory appeal for lack of jurisdiction and (2) conditionally grant ERCOT's petition for writ of mandamus and direct the trial court to vacate its order denying ERCOT's plea to the jurisdiction based on sovereign immunity and dismiss this case for lack of jurisdiction. If the trial court fails to do so, the writ will issue. Further, we vacate this Court's July 28, 2017 stay order.

Specifically, appellees/real parties in interest are Panda Power Generation Infrastructure Fund, LLC d/b/a Panda Power Funds; Panda Sherman Power Holdings, LLC; Panda Sherman Power Intermediate Holdings I, LLC; Panda Sherman Power Intermediate Holdings II, LLC; Panda Sherman Power, LLC; Panda Temple Power Holdings, LLC; Panda Temple Power Intermediate Holdings I, LLC; Panda Temple Power Intermediate Holdings II, LLC; Panda Temple Power, LLC; Panda Temple Power II Holdings LLC; Panda Temple Power II Intermediate Holdings I, LLC; Panda Temple Power II Intermediate Holdings II, LLC; and Panda Temple Power II, LLC.

Panda contends its damages are "ongoing" and have not yet been calculated. In a "preliminary response" to ERCOT's requests for disclosure during discovery in this case, Panda described alleged losses and damages totaling more than $1 billion.

In an order dated July 28, 2017, this Court granted a motion by ERCOT for emergency temporary relief and stayed all trial court proceedings pending resolution of this consolidated proceeding.

Specifically, section 39.151 includes the following provisions respecting the budget and operations of the certified ISO:
(d-1) The commission shall require an independent organization certified by the commission under this section to submit to the commission the organization's entire proposed annual budget. The commission shall review the proposed budgets either annually or biennially and may approve, disapprove, or modify any item included in a proposed budget. The commission by rule shall establish the type of information or documents needed to effectively evaluate the proposed budget and reasonable dates for the submission of that information or those documents. The commission shall establish a procedure to provide public notice of and public participation in the budget review process.
(d-2) Except as otherwise agreed to by the commission and an independent organization certified by the commission under this section, the organization must submit to the commission for review and approval proposals for obtaining debt financing or for refinancing existing debt. The commission may approve, disapprove, or modify a proposal.
(d-3) An independent organization certified by the commission under this section shall develop proposed performance measures to track the organization's operations. The independent organization must submit the proposed performance measures to the commission for review and approval. The commission shall review the organization's performance as part of the budget review process under Subsection (d-1). The commission shall prepare a report at the time the commission approves the organization's budget detailing the organization's performance and submit the report to the lieutenant governor, the speaker of the house of representatives, and each house and senate standing committee that has jurisdiction over electric utility issues.
(d-4) The commission may:
(1) require an independent organization to provide reports and information relating to the independent organization's performance of the functions prescribed by this section and relating to the organization's revenues, expenses, and other financial matters;
(2) prescribe a system of accounts for an independent organization;
(3) conduct audits of an independent organization's performance of the functions prescribed by this section or relating to its revenues, expenses, and other financial matters and may require an independent organization to conduct such an audit;
(4) inspect an independent organization's facilities, records, and accounts during reasonable hours and after reasonable notice to the independent organization;
(5) assess administrative penalties against an independent organization that violates this title or a rule or order adopted by the commission ... and
(6) resolve disputes between an affected person and an independent organization and adopt procedures for the efficient resolution of such disputes.
Id. § 39.151(d-1)-(d-4).

Pursuant to section 39.151(g), the ISO's governing body must be composed of
(1) the chairman of the commission as an ex officio nonvoting member;
(2) the counsellor as an ex officio voting member representing residential and small commercial consumer interests;
(3) the chief executive officer of the independent organization as an ex officio voting member;
(4) six market participants elected by their respective market segments to serve one-year terms, with:
(A) one representing independent generators;
(B) one representing investor-owned utilities;
(C) one representing power marketers;
(D) one representing retail electric providers;
(E) one representing municipally owned utilities; and
(F) one representing electric cooperatives;
(5) one member representing industrial consumer interests and elected by the industrial consumer market segment to serve a one-year term;
(6) one member representing large commercial consumer interests selected in accordance with the bylaws to serve a one-year term; and
(7) five members unaffiliated with any market segment and selected by the other members of the governing body to serve three-year terms.
Id. § 39.151(g). The presiding officer of the governing body must be one of the members described by subsection (g)(7). Id. § 39.151(g-1).

Specifically, the bylaws of the ISO and the rules of the PUC "may provide for the governing body or subcommittee to enter into executive session closed to the public to address sensitive matters such as confidential personnel information, contracts, lawsuits, competitively sensitive information, or other information related to the security of the regional electrical network." Id. § 39.1511.

ERCOT asserts in its reply brief in this Court that an "energy-only" market design "means that prices paid compensate only the energy sold at that moment; they do not include capacity payments that compensate generators for building plants and keeping them in operation." According to ERCOT, "Under this market design, increased generation capacity is built by private investors when they believe that future demand will be sufficiently high compared with future generation capacity."

Among the provisions of administrative code section 25.505 is the following:
(c) Statement of opportunities (SOO). ERCOT shall publish a SOO that provides market participants with a projection of the capability of existing and planned electric generation resources, load resources, and transmission facilities to reliably meet ERCOT's projected needs.... ERCOT shall prescribe reporting requirements for generation entities and transmission service providers (TSPs) to report to ERCOT their plans for adding new facilities, upgrading existing facilities, and mothballing or retiring existing facilities....
Id. § 25.505(c).

In addition to the arguments in its consolidated brief in this Court, Panda has filed in this Court a motion to dismiss ERCOT's interlocutory appeal for lack of jurisdiction. We consider the arguments in that motion in this proceeding.

In light of the supreme court's conclusion that UIW "is a governmental unit for purposes of law enforcement" and therefore "entitled to pursue an interlocutory appeal under section 51.014(a)(8)," that case was remanded to the Fourth District Court of Appeals in San Antonio for determination of whether UIW's police department was entitled to immunity. See id. Subsequently, that court of appeals affirmed the trial court's denial of UIW's plea to the jurisdiction. Univ. of Incarnate Word v. Redus , No. 04-15-00120-CV, --- S.W.3d ----, ----, 2018 WL 1176652, at *1 (Tex. App.-San Antonio Mar. 7, 2018, no pet. h.) (concluding that "based on the record in this appeal," UIW "is not a governmental unit for purposes of the common law doctrine of sovereign immunity").

In a concurring opinion in which Justice Willett and Justice Guzman joined, Chief Justice Hecht stated in part, "An independent contractor may act as the government, in effect becoming the government for limited purposes, and when it does, it should be entitled to the government's immunity." Id. at 129 (Hecht, C.J., concurring) (emphasis original).