**Reverse and Remand and Opinion Filed February 23, 2022**



In The
## Court of Appeals
## Fifth District of Texas at Dallas

### No. 05-18-00611-CV

**PANDA POWER GENERATION INFRASTRUCTURE FUND, LLC, D/B/A/ PANDA POWER FUNDS; PANDA SHERMAN POWER HOLDINGS, LLC; PANDA SHERMAN POWER INTERMEDIATE HOLDINGS I, LLC; PANDA SHERMAN POWER INTERMEDIATE HOLDINGS II, LLC; PANDA SHERMAN POWER, LLC; PANDA TEMPLE POWER HOLDINGS, LLC; PANDA TEMPLE POWER INTERMEDIATE HOLDINGS I, LLC; PANDA TEMPLE POWER INTERMEDIATE HOLDINGS II, LLC; PANDA TEMPLE POWER, LLC; PANDA TEMPLE POWER II HOLDINGS, LLC; PANDA TEMPLE POWER II INTERMEDIATE HOLDINGS I, LLC; PANDA TEMPLE POWER II INTERMEDIATE HOLDINGS II, LLC; PANDA TEMPLE POWER II, LLC, Appellants
V.
ELECTRIC RELIABILITY COUNCIL OF TEXAS, INC., Appellee**

**On Appeal from the 15th Judicial District Court
Grayson County, Texas
Trial Court Cause No. CV-16-0401**

## OPINION

Before the Court sitting En Banc
Opinion by Justice Nowell

Before us is an appeal from the trial court's April 24, 2018 order granting

ERCOT's plea to the jurisdiction based on sovereign immunity and dismissing the

cause for lack of jurisdiction. The trial court entered the dismissal order pursuant to

this Court's original opinion in this case. *See Elec. Reliability Council of Tex., Inc. v. Panda Power Generation Infrastructure Fund, LLC (Panda I)*, 552 S.W.3d 297 (Tex. App.—Dallas 2018, pet. dism'd w.o.j.). Panda[1] appeals the trial court's order and presents two arguments: (1) ERCOT is not entitled to sovereign immunity, and (2) the Texas Legislature did not grant exclusive jurisdiction over Panda's common law claims to the Public Utility Commission of Texas (PUC). We decide both issues in favor of Panda; we conclude ERCOT is not entitled to sovereign immunity and the Legislature did not grant exclusive jurisdiction over Panda's claims to the PUC. To the extent we previously held otherwise, that holding is in error. We reverse the trial court's April 24, 2018 order granting ERCOT's plea to the jurisdiction and remand this case to the trial court for further proceedings.

BACKGROUND

A.  **Regulatory Scheme**

The wholesale electric power industry consists of the generation of electrical power, the transmission of electricity over power lines, and the distribution of power to customers. *Tex. Mun. Power Agency v. Pub. Util. Comm'n of Tex.*, 253 S.W.3d

---

[1] Specifically, the appellants in this case are Panda Power Generation Infrastructure Fund, LLC d/b/a Panda Power Funds; Panda Sherman Power Holdings, LLC; Panda Sherman Power Intermediate Holdings I, LLC; Panda Sherman Power Intermediate Holdings II, LLC; Panda Sherman Power, LLC; Panda Temple Power Holdings, LLC; Panda Temple Power Intermediate Holdings I, LLC; Panda Temple Power Intermediate Holdings II, LLC; Panda Temple Power, LLC; Panda Temple Power II Holdings, LLC; Panda Temple Power II Intermediate Holdings I, LLC; Panda Temple Power II Intermediate Holdings II, LLC; and Panda Temple Power II, LLC. We refer to them collectively as "Panda." Appellants represent that Panda Temple Power Intermediate Holdings II, LLC is now known as Temple Generation Intermediate Holdings II, LLC and Panda Temple Power, LLC is now known as Temple Generation I, LLC.

184, 186 (Tex. 2007) (citing *Pub. Util. Comm'n v. City Pub. Serv. Bd.*, 53 S.W.3d 310, 312 (Tex. 2001)). Historically, the entire industry was a natural monopoly. *See TXU Generation Co., L.P. v. Pub. Util. Comm'n of Tex.*, 165 S.W.3d 821, 827 (Tex. App.—Austin 2005, pet. denied).

In the 1990s, the Texas Legislature found that "the public interest in competitive electric markets requires that . . . electric services and their prices should be determined by customer choices and the normal forces of competition." TEX. UTIL. CODE ANN. § 39.001(a); *see also TXU Generation Co., L.P.*, 165 S.W.3d at 827 (citing TEX. UTIL. CODE ANN. § 39.001(a)) ("[I]n recognition that the power generation and power distribution components of the electricity industry are not monopolies warranting strict regulation, the legislature has opened the wholesale electricity markets and retail electricity market to competition and market forces."). To achieve that goal, the Legislature enacted Chapter 39 of the Texas Utilities Code, also known as the Texas Public Utility Regulatory Act (PURA), which restructured the electric utility industry in Texas. *See* TEX. UTIL. CODE ANN. §§ 39.001–.918.

Section 39.151 requires the PUC to certify one or more "independent organizations" to perform the following functions:

> (1) ensure access to the transmission and distribution systems for all buyers and sellers of electricity on nondiscriminatory terms;
> (2) ensure the reliability and adequacy of the regional electrical network;
> (3) ensure that information relating to a customer's choice of retail electric provider is conveyed in a timely manner to the persons who need that information; and

(4) ensure that electricity production and delivery are accurately accounted for among the generators and wholesale buyers and sellers in the region.

TEX. UTIL. CODE ANN. § 39.151(a). PURA defines an "independent organization" as "an independent system operator or other person that is sufficiently independent of any producer or seller of electricity that its decisions will not be unduly influenced by any producer or seller." *Id.* § 39.151(b). In 2001, the PUC certified ERCOT, an organization that was founded in 1970 to coordinate utilities in Texas, as the independent system operator (ISO) to perform the functions described in section 39.151(a). ERCOT has acted as the ISO since it was certified in 2001.

ERCOT describes itself as an independent, membership-based 501(c)(4) nonprofit corporation. ERCOT's bylaws define which types of entities can become ERCOT members. Each member has voting rights and pays annual dues to ERCOT. ERCOT is operated by a chief executive officer and a board of directors.

ERCOT's bylaws and protocols must be approved by the PUC and reflect the PUC's input. *See* TEX. UTIL. CODE ANN. § 39.151(g-1). The current bylaws require that every board member be a resident of Texas and prohibit any legislator from serving as a member. *Id.* § 39.151(g-1). To maintain certification as the ISO, ERCOT's governing body must be composed of persons selected by the ERCOT board selection committee. *See id.* § 39.151(g). The board is composed of eleven members, including the PUC chairman who is an ex officio nonvoting board member. *See id.* § 39.151(g-1). The utilities code sets forth other qualifications for

the board's composition. *See id.* § 39.151(g-1)–(g-6). ERCOT's bylaws state the board hires the CEO who, under the board's supervision and direction, carries out ERCOT's general affairs. With limited exceptions, meetings of ERCOT's governing body or a subcommittee that includes a member of the governing body must be open to the public. *See id.* § 39.1511.

PURA section 39.151(d) requires the PUC to "adopt and enforce rules relating to the reliability of the regional electrical network and account[] for the production and delivery of electricity among generators and all other market participants." *Id.* § 39.151(d). However, the PUC may delegate these responsibilities to an ISO; the ISO's rules and enforcement actions remain subject to the PUC's oversight. *See id.* Section 39.151(d) continues:

> An independent organization certified by the commission is directly responsible and accountable to the commission. The commission has complete authority to oversee and investigate the organization's finances, budget, and operations as necessary to ensure the organization's accountability and to ensure that the organization adequately performs the organization's functions and duties. The organization shall fully cooperate with the commission in the commission's oversight and investigatory functions. The commission may take appropriate action against an organization that does not adequately perform the organization's functions or duties or does not comply with this section, including decertifying the organization or assessing an administrative penalty against the organization.

*Id.*

As the ISO, ERCOT must submit its entire proposed annual budget for approval, disapproval, or modification to the PUC. *See id.* § 39.151(d-1). "The

commission shall establish a procedure to provide public notice of and public participation in the budget review process." *Id*. After approving the budget, the PUC authorizes ERCOT to charge wholesale buyers and sellers a "system administration fee, within a range determined by the commission, that is reasonable and competitively neutral to fund the independent organization's approved budget." *Id*. § 39.151(e). ERCOT is required "to closely match actual revenues generated by the fee and other sources of revenue with revenue necessary to fund the budget." *Id*. The PUC requires ERCOT to submit reports comparing actual expenditures with budgeted expenditures. *See id*.

Additionally, ERCOT "is subject to review under Chapter 325, Government Code (Texas Sunset Act), but is not abolished under that chapter." *Id*. § 39.151(n). The PUC is required to "adopt procedures governing decertification of an independent organization, selecting and certifying a successor organization, and transferring assets to the successor organization to ensure continuity of operations in the region." *Id*. § 39.151(d).

## B. Pending Lawsuit

The PUC requires ERCOT to publish "resource adequacy reports" at least annually that provide a five-year forecast of the Texas power region's ability to generate and transmit sufficient electricity to meet projected demands. 16 TEX. ADMIN. CODE § 25.505(c); *see also Elec. Reliability Council of Tex., Inc. v. Panda Power Generation Infrastructure Fund, LLC (Panda I Appeal)*, 619 S.W.3d 628,

631–32 (Tex. 2021). To fulfill this duty, ERCOT publishes a "Report on Capacity, Demand, and Reserves" twice a year, in May and December. *Panda I Appeal*, 619 S.W.3d at 632. These "CDR Reports" provide predictions on future electricity demands within the Texas power region and the region's ability to supply sufficient electricity to meet those demands. *Id*. Participants in the electric industry rely on ERCOT's CDR Reports when deciding, for example, whether to invest in new generation plants or transmission facilities. *Id*.

Panda alleges that in 2011 and 2012, ERCOT used its CDR Reports, press releases, presentations, and ERCOT-sponsored press interviews to broadcast false market information throughout Texas. According to Panda, the information ERCOT provided projected a "serious and long-term scarcity of power supply." However, Panda asserts ERCOT knew there was no long-term scarcity projected; rather, ERCOT published false market data to "encourage investors and their financial sponsors to build new power generation." Panda claims it relied on the false information when it decided to invest $2.2 billion to build three new power plants. After Panda began construction, ERCOT revised its forecasts and—instead of projecting a shortfall—it predicted an excess of generation capacity in the ERCOT region. Panda's suit alleges ERCOT's CDR Reports, press releases, presentations, and press interviews were "made negligently and fraudulently and possibly to further expectations of special or personal interests." Panda maintains that as a direct result of the misrepresentations, it now sells power at a fraction of the price for which it

would have sold power had ERCOT's representations been true. Panda sued ERCOT for fraud, negligent misrepresentation, and breach of fiduciary duty.

ERCOT filed a plea to the jurisdiction seeking dismissal of Panda's claims on the ground that the PUC has exclusive jurisdiction to resolve Panda's complaints and, therefore, the trial court lacked subject matter jurisdiction. The trial court denied the plea. ERCOT then filed a plea to the jurisdiction based on sovereign immunity, which the trial court denied. In *Panda I*, this Court determined ERCOT's complained-of actions were protected by immunity and directed the trial court to vacate its order denying ERCOT's plea to the jurisdiction based on sovereign immunity and dismiss the case for lack of jurisdiction. *See Panda I*, 552 S.W.3d at 319, 320.[2] The Court did not reach ERCOT's argument that the PUC has exclusive jurisdiction to resolve Panda's complaints. *See id.* at 301. The trial court complied with this Court's instruction and dismissed the case for lack of jurisdiction. Before this en banc Court is Panda's appeal from the trial court's order dismissing its claims for want of jurisdiction.

---

[2] The procedural history of this case is presented thoroughly in the Texas Supreme Court's prior opinion in this case. *See Panda I Appeal*, 619 S.W.3d at 632-34. We need not recite the history here as well. *See* TEX. R. APP. P. 47.1.

LAW & ANALYSIS

### A.  En Banc Review

The "law of the case" doctrine "mandates that the ruling of an appellate court on a question of law raised on appeal will be regarded as the law of the case in all subsequent proceedings unless clearly erroneous." *Caplinger v. Allstate Ins. Co.*, 140 S.W.3d 927, 929 (Tex. App.—Dallas 2004, pet. denied) (citing *Briscoe v. Goodmark Corp.*, 102 S.W.3d 714, 716 (Tex. 2003)). Relatedly, "[o]nce a panel of this Court has spoken, subsequent panels are powerless to contradict that decision, barring reconsideration by the Court sitting en banc or an intervening decision by the supreme court." *Chakrabarty v. Ganguly*, 573 S.W.3d 413, 415 (Tex. App.—Dallas 2019, no pet.) (en banc) (citing *MobileVision Imaging Servs., L.L.C. v. LifeCare Hosps. of N. Tex., L.P.*, 260 S.W.3d 561, 566 (Tex. App.—Dallas 2008, no pet.)); *see also* TEX. R. APP. P. 41.2(c) (en banc consideration should not be ordered "unless necessary to secure or maintain uniformity of the court's decisions or unless extraordinary circumstances require en banc consideration").

In *Panda I*, this Court determined ERCOT "is entitled to sovereign immunity from private damages suits in connection with the discharge of its regulatory responsibilities," and ERCOT's actions implicated in this lawsuit are protected by sovereign immunity. *Panda I*, 552 S.W.3d at 318, 319. Although the supreme court considered this case in *Panda I Appeal*, the supreme court ultimately determined the issues before it were moot and did not reach the merits. *See Panda I Appeal*, 619

S.W.3d at 631. Accordingly, until today, *Panda I* remains the law of the case, and that decision cannot be contradicted barring reconsideration by this Court sitting en banc. *See Caplinger*, 140 S.W.3d at 929; *Chakrabarty*, 573 S.W.3d at 415.

Since *Panda I*, the Texas Supreme Court has issued three opinions analyzing and applying either the doctrine of sovereign immunity or governmental immunity. *See Univ. of the Incarnate Word v. Redus (UIW II)*, 602 S.W.3d 398 (Tex. 2020); *El Paso Educ. Initiative, Inc. v. Amex Props., LLC*, 602 S.W.3d 521 (Tex. 2020); *Rosenberg Dev. Corp. v. Imperial Performing Arts, Inc*., 571 S.W.3d 738 (Tex. 2019). In each case, the court considered whether and on what grounds to extend immunity. In the most recent of these three opinions, the supreme court stated: "Though we have contemplated it, we have yet to extend sovereign immunity to a purely private entity—one neither created nor chartered by the government—even when that entity performs some governmental functions." *UIW II*, 602 S.W.3d at 401 (discussing *Rosenberg*, 571 S.W.3d at 750).

This Court in *Panda I* extended immunity to a private, membership-based, nonprofit corporation that was neither created nor chartered by the government. In light of the three recent supreme court opinions, and as discussed below, this en banc Court concludes the holdings in *Panda I* that "ERCOT is entitled to sovereign immunity from private damages suits in connection with the discharge of its regulatory responsibilities" and that ERCOT's actions alleged in this lawsuit are

–10–

protected by sovereign immunity are clearly erroneous.[3] Therefore, while en banc consideration generally is disfavored, *see* TEX. R. APP. P. 41.2(c), it is appropriate in this case to correct our prior, erroneous decision.

### B.  Sovereign Immunity

Sovereign immunity provides that "no state can be sued in her own courts without her consent, and then only in the manner indicated by that consent." *UIW II*, 602 S.W.3d at 403. The supreme court examines sovereign immunity in three contexts outside of the State government: political subdivisions,[4] legislatively authorized entities, and government contracts.[5] *Id.* at 404. When determining whether a legislatively authorized entity that is not a political subdivision has immunity, a court will "consider whether the authorizing statute evinces clear legislative intent to vest the entity with the nature, purposes, and powers of an arm of the State government." *Id.* at 405 (internal quotation marks and footnotes omitted). If the entity is so vested, then the entity is a government unit unto itself and is entitled to assert immunity in its own right when it performs a governmental function. *Id.* "If, however, an entity's underlying nature, purposes[,] and powers are

---

[3] In *Panda I*, we also concluded ERCOT is not a "governmental unit" for purposes of section 51.014(a)(8) of the Texas Civil Practices and Remedies Code. *See Panda I*, 552 S.W.3d at 309 (citing TEX. CIV. PRAC. & REM. CODE ANN. § 51.014(a)(8)). We do not reconsider that holding in this appeal.

[4] Political subdivisions of the State include counties, municipalities, and school districts. *UIW II*, 602 S.W.3d at 404. ERCOT does not argue it is a political subdivision of the State.

[5] Counsel for ERCOT confirmed during oral argument before the Texas Supreme Court that ERCOT does not claim to be a government contractor.

–11–

not congruent with an arm of State government, then the legislature cannot de facto grant it sovereign immunity." *Id.* (internal quotation marks and footnotes omitted).

Sovereign immunity respects "the relationship between the legislative and judicial branches of government" and "preserves separation-of-powers principles by preventing the judiciary from interfering with the Legislature's prerogative to allocate tax dollars." *Amex Props.*, 602 S.W.3d at 528; *see also UIW II*, 602 S.W.3d at 404; *Nettles v. GTECH Corp.*, 606 S.W.3d 726, 737–38 (Tex. 2020) ("In addition to the pecuniary justification of protecting the public fisc . . ., considerations of government structure underlie the immunity doctrine."). The judiciary defines the boundaries of the common law doctrine of sovereign immunity and "determine[s] under what circumstances sovereign immunity exists in the first instance." *UIW II*, 602 S.W.3d at 404, 411. The "legislature informs that decision when it authorizes an entity to act as an arm of the State government." *Id.* at 404.

The case before us presents a boundary question—we must decide whether sovereign immunity extends to ERCOT, a private, independent, membership-based 501(c)(4) nonprofit corporation that the PUC has authorized to serve as the ISO, but that is not created or chartered by the government.

### 1. Standard of Review

Immunity from suit implicates a court's subject matter jurisdiction and is properly asserted in a plea to the jurisdiction. *Nettles*, 606 S.W.3d at 731. Because subject matter jurisdiction is a question of law, we review de novo a trial court's

ruling on a plea to the jurisdiction. *Id.* In this examination, we are "not required to look solely to the pleadings but may consider evidence and must do so when necessary to resolve the jurisdictional issues raised." *Id.* at 734.

### 2. *Recent Supreme Court Decisions*

Three recent supreme court opinions analyze and apply the doctrines of governmental and sovereign immunity and lay the foundation for our analysis.

### a. *Rosenberg Development Corp. v. Imperial Performing Arts, Inc.*, 571 S.W.3d 738 (Tex. 2019)

The Texas Development Corporation Act authorizes political subdivisions to create nonprofit corporations to undertake projects designed to spur economic growth and reduce unemployment. *Rosenberg*, 571 S.W.3d at 741 (citing TEX. LOC. GOV'T CODE §§ 501.001–507.202). The Act expressly denies those entities status as political subdivisions and forbids authorizing municipalities from delegating any attributes of sovereignty to those entities. *Id.* (citing TEX. LOC. GOV'T CODE §§ 501.010, .055(b)). When adopting the Act, the Legislature determined that establishing and funding economic development corporations is in the public interest and serves a public purpose. *Id.* at 744 (discussing TEX. LOC. GOV'T CODE § 501.004(a)(1), (4), (6)).

The economic development corporations are authorized to finance projects that may be funded in part by local taxes or the proceeds of revenue bonds. *Id.* (citing TEX. LOC. GOV'T CODE §§ 501.151, .201, 504.251–.254, 505.251–.254, .302). The entities may only incur financial obligations that can be paid from bond proceeds,

revenue realized from the lease or sale of a project, revenue realized from a loan to finance or refinance a project, or money granted under contract with a municipality. *Id.* at 745 (citing TEX. LOC. GOV'T CODE § 501.008). Although the entities are private, the Legislature requires them to comply with the Texas Open Meetings Act and the Texas Public Information Act. *Id.* Additionally, "authorizing municipalities have some supervisory control over economic development corporations. Ultimately, however, all of the powers of the corporation are vested in the corporation's board of directors." *Id.* (cleaned up).

Pursuant to its authority under the Act, the City of Rosenberg created the Rosenberg Development Corporation (RDC) to promote, assist, and enhance economic and industrial development activities and promote or develop new or expanded business enterprises, including public facilities. *Id.* at 741. To that end, the RDC executed a contract with a nonprofit organization, Imperial Performing Arts, Inc. *Id.* at 741–42. Subsequently, the parties found themselves crossways, and Imperial sued the RDC for breach of contract and sought a declaratory judgment. *Id.* at 742. In the litigation, the question arose whether the RDC was immune from suit. *See id.* at 742–43.

The supreme court described the issue in *Rosenberg* as: "whether a municipally created economic development corporation is entitled to immunity from suit as if it were a political subdivision of the state," even though it is neither a sovereign entity nor a political subdivision of the State. *Id.* at 741, 747. The court

–14–

began by considering whether the Legislature intended the entity to have "discrete governmental-entity status separate and apart from its authorizing municipality," and concluded the Legislature did not. *Id.* at 748. Ordinarily, an "entity claiming governmental immunity must . . . be a political subdivision." *Id.* But the RDC was not; the Legislature expressly rejected an economic development corporation's political-subdivision status. *Id.* at 748–49. Nevertheless, the court proceeded to consider whether the governing statutory authority demonstrated a legislative intent to grant an economic development corporation the "nature, purposes, and powers" of an arm of the State government. *Id.* at 749.

The Legislature described economic development corporations as private, nonprofit corporations and empowered them as such. *Id.* "More significantly, the Legislature has expressly denied economic development corporations significant governmental characteristics—political-subdivision status and attributes of sovereignty." *Id.* For example, the Legislature prohibited an authorizing municipality from delegating any of its attributes of sovereignty, "including the power to tax, the power of eminent domain, and the police power," to the entity. *Id.*

The fact that RDC was a heavily regulated entity and that it engaged in an act serving a public purpose did not equate to governmental-entity status. *Id.* at 750. "Serving public purposes, as many nonprofits and public contractors do, does not ipso facto equate to status as a governmental entity for governmental immunity purposes." *Id.* The court concluded "economic development corporations are not

governmental entities in their own right and therefore are not entitled to governmental immunity." *Id.* at 741.

>    b.    *El Paso Education Initiative, Inc. v. Amex Properties, LLC*, 602 S.W.3d 521 (Tex. 2020)

Public school districts are generally entitled to governmental immunity from liability and suit. *Amex Props.*, 602 S.W.3d at 526. In *Amex Properties*, the supreme court considered whether open-enrollment charter schools have governmental immunity to the same extent as public schools. *Id.* at 527.

A charter school district that operated open-enrollment charter schools in El Paso under charters from the Texas Education Agency explored sites for a new school. *Id.* at 524. The president and superintendent of the charter school district entered into an agreement with Amex Properties. *Id.* at 524–25. Subsequent disputes between the parties led Amex Properties to sue the charter school district for anticipatory breach of a lease. *Id.* at 526. In response, the district filed pleas to the jurisdiction asserting its immunity from suit. *Id.*

The State constitution requires the Legislature to provide a system of free public schools. *Id.* at 528 (quoting TEX. CONST. art. VII, § 1). Since 1995, open-enrollment charter schools have been "part of the public school system of this state." *Id.* (quoting TEX. EDUC. CODE ANN. § 12.105). Charter schools operate under a contract, the charter, with the Commissioner of Education. *Id.*

Typically, a charter holder is a private, nonprofit organization, but it must adhere to State law and the Commissioner's regulations governing public schools;

if it fails to do so, it risks revocation of its charter. *Id.* at 528–29. "Like public school districts, open-enrollment charter schools are largely publicly-funded," receiving billions of dollars of public funds annually. *Id.* at 529. The Legislature directs that "[i]n matters related to operation of an open-enrollment charter school, an open-enrollment charter school or charter holder is immune from liability and suit to the same extent as a school district." *Id.* (quoting TEX. EDUC. CODE ANN. § 12.1056(a)).

The supreme court concluded that open-enrollment charter schools act as an arm of the State government. *Id.* "These schools are accountable to State government through oversight of their charters and through the receipt of substantial public funding. They exercise the same powers and perform government tasks in the same manner as traditional public schools. They expressly operate as part of the State's public education system, and they are generally open to the public." *Id.* at 529–30 (internal footnotes omitted).

Additionally, extending immunity to these schools "satisfies governmental immunity's purposes." *Id.* at 530.

> Diverting charter school funds to defend lawsuits and pay judgments affects the State's provision of public education and reallocates taxpayer dollars from the legislature's designated purpose. Conferring immunity respects the legislature's decision to fulfill its constitutional obligation to provide a free, public education through charter schools, its allocation of tax dollars to meet that objective, and its directive that charter schools and charter-holders have immunity from suit and liability to the same extent as public schools.

*Id.* (footnotes omitted). The court concluded open-enrollment charter schools and their charter-holders have governmental immunity from suit and liability to the same extent as public schools. *Id.* at 524.

c. *University of the Incarnate Word v. Redus*, 602 S.W.3d 398 (Tex. 2020)

The Texas Education Code authorizes private universities to commission and employ peace officers, and pursuant to that authority, the University of the Incarnate Word, a private university, established a police department. *UIW II*, 602 S.W.3d at 401 (citing TEX. EDUC. CODE ANN. § 51.212(a)). The code also vests university officers "with all the powers, privileges, and immunities of peace officers." TEX. EDUC. CODE ANN. § 51.212(b). But the code does not extend sovereign immunity to an officer's private university employer. *UIW II*, 602 S.W.3d at 401. After a student was fatally shot by a university peace officer, the student's parents sued the university, and the university asserted the State's sovereign immunity should be extended to the university for actions taken within the scope of the authority conferred by the statute. *See id.* at 402, 407.

Sovereign immunity is entity-based. *Id.* at 407. In this case, the State did not charter or create the University; the State does not fund the university's police department or set the department's policies, procedures, or protocols; and the State does not hire or fire the university's officers. *Id.* Rather, the university's administration and private governing board were responsible for the police department's day-to-day operations and decision making. *Id.* Additionally, the State

–18–

did not exercise control over the university's activities that might be considered "governmental." *See id.* at 407–08. Rather, the university's governing board was in charge of the police department, and that board was not accountable to the taxpayers or to public officials. *Id.* at 408. "Because the University's police department is not accountable to the government, we conclude that the University is not an arm of the State government." *Id.*

The court also concluded that extending sovereign immunity to the University would not further the doctrine's purposes of preserving separation of powers and protecting the public treasury because no tax dollars were at stake in the lawsuit. *Id.* at 409. Further, the Legislature neither mandated nor funded private university police departments. *Id.* Finally, the court discerned no legislative directive that private-university police departments have sovereign immunity. *Id.* at 411. Therefore, the court concluded, sovereign immunity did not extend to the private university. *Id.* at 413.

### 3. ERCOT Is Not An Arm of the State

ERCOT argues it is immune from suit because it is a legislatively authorized entity that has the nature, purposes, and powers of an arm of the State. ERCOT asserts it exclusively performs public functions; it is an essential part of the State's comprehensive regulatory system for electrical utilities; it exclusively performs functions assigned by the Legislature and the PUC; and its functions are performed

for a public purpose. ERCOT claims it performs these functions "using quintessential sovereign power: the power to make binding law."

Conversely, Panda argues PURA contains no evidence suggesting the Legislature intended to vest ERCOT with the nature, purposes, and powers of an arm of the State government. Rather than create a state agency to serve as the grid operator, the Legislature permitted the PUC to license an already existing private entity (ERCOT) to perform the function.[6]

In this case, we do not have the clear expressions of legislative intent the supreme court considered in *Rosenberg* and *Amex Properties.* Accordingly, we consider whether extending sovereign immunity to ERCOT would serve the nature and purposes of immunity. *See UIW II*, 602 S.W.3d at 401; *Amex Props.*, 602 S.W.3d at 528; *Rosenberg*, 571 S.W.3d at 750. "The facts presented in this case do not fall neatly into any camp." *UIW II*, 602 S.W.3d at 406. On one hand, the Legislature authorized the PUC to choose an ISO and, following that instruction, the PUC chose ERCOT. The PUC maintains some authority over ERCOT, including the authority to decertify ERCOT. But on the other, ERCOT is a purely private entity that is not created or chartered by the government, maintains some autonomy, is operated and overseen by its CEO and board of directors, and does not receive any tax revenue.

---

[6] Panda also argues that because ERCOT is not a governmental unit, it cannot be an arm of the State. Whether an entity qualifies as a governmental unit and whether an entity has sovereign immunity are separate questions with separate analytical frameworks. *Rosenberg*, 571 S.W.3d at 748.

ERCOT was established decades before the Legislature deregulated the Texas energy market and authorized the PUC to oversee the market participants. When the Legislature restructured the energy markets in the 1990s, it did so to create competition while also seeking to ensure that market conditions were met. The Legislature chose not to place a State agency in charge of administering the new market and instead assigned the responsibility of choosing an ISO to the PUC. The PUC chose ERCOT, an existing private, independent, membership-based organization that already performed some of the responsibilities that would be assigned to ERCOT as the ISO.

ERCOT is operated by its CEO and board of directors; the utilities code dictates qualifications for board members. *See* TEX. UTIL. CODE ANN. § 39.151(g-1)–(g-5); *see also UIW II*, 602 S.W.3d at 406 (noting private university's board of trustees and not the State controlled the University's police department). While ERCOT's board must include the PUC Chairman, that person is an ex officio nonvoting member. *See* TEX. UTIL. CODE ANN. § 39.151(g-1)(1). The board hires the CEO who, under the board's supervision and direction, carries out ERCOT's general affairs. To maintain ERCOT's certification as the ISO, ERCOT's board must establish and implement a formal process for adopting new protocols or revisions to existing protocols. *See id.* § 39.151(g-6). These protocols may not take effect until the PUC approves a market impact statement describing the new or revised

protocols. *Id.* The PUC is not given authority to approve or disapprove of the protocols; the PUC's role is limited to issuing market impact statements. *See id.*

PURA dictates ERCOT's functions as the ISO, *see id.* § 39.151(a), but PURA does not dictate how ERCOT performs those functions; the method of performance is wholly within ERCOT's discretion. Likewise, while the PUC has several opportunities to investigate, approve, disapprove, and review ERCOT's actions, ERCOT charts its own course, decides which actions to take, and how to operate its organization. While ERCOT may be confined by the PUC's influence, neither the PUC nor the Legislature controls ERCOT's day-to-day operations. Even in matters where the PUC has oversight authority, ERCOT, like other private organizations, is primarily operated by its CEO and board.

Even though ERCOT is operated by its own CEO and board, the Legislature demands transparency with regard to corporate endeavors by requiring its board meetings and meetings of any subcommittee that includes a board member to be open to the public and made accessible. *See id.* § 39.1511. Board members with conflicts of interest must recuse themselves. *See id.* § 39.1512. These facts are similar to those in *Rosenberg*. *See Rosenberg*, 571 S.W.3d at 745 ("Even though the corporations are private entities, the Legislature demands transparency with regard to corporate endeavors by requiring compliance with the Texas Open Meetings Act and the Texas Public Information Act.").

The PUC exercises influence over ERCOT's budget. *See* TEX. UTIL. CODE ANN. § 39.151(d-1). ERCOT charges wholesale buyers a system administration fee that is within a range set by the PUC, but the PUC does not establish the fee. *See id.* § 39.151(e); *see also Rosenberg*, 571 S.W.3d at 747-48 (describing statutory limitations on the economic development corporations' finances). The PUC may decertify ERCOT, but it is not authorized to dissolve ERCOT. *But cf. Amex Props.*, 602 S.W.3d at 528–29 (private, nonprofit organization risks revocation of its charter if it fails to adhere to state law and the Commissioner's regulations governing public schools).

Although ERCOT argues it has the power to make binding law, which it calls the "quintessential sovereign power," the applicable statutes do not support this argument. The PUC is required to adopt and enforce rules relating to the reliability of the regional electrical network and accounting for the production and delivery of electricity among generators and other market participants. *See* TEX. UTIL. CODE ANN. § 39.151(d). The PUC may delegate this duty to the ISO. *See id.* However, any rules adopted by and any enforcement actions taken by the ISO under its delegated authority are subject to the PUC's oversight and may not take effect before receiving PUC approval. *See id.* ("Rules adopted by an independent organization and enforcement actions taken by the organization under delegated authority from the commission are subject to commission oversight and review and may not take effect before receiving commission approval."). In practice, then, ERCOT suggests or

recommends rules and enforcement actions to the PUC, and the PUC chooses whether to give its approval to those proposals so that they become binding law. The Texas Utilities Code does not bestow the "quintessential sovereign power" to make binding law upon ERCOT.[7]

ERCOT is a private organization subject to regulations and PUC oversight. In this respect, ERCOT is akin to the economic development corporation in *Rosenberg*. Like ERCOT, the RDC argued it was not an ordinary nonprofit corporation because it was subject to statutory restrictions and requirements, such as open-government requirements, that generally do not apply to non-governmental organizations. *Rosenberg*, 571 S.W.3d at 750. The supreme court responded by stating: "But heavily regulating an entity does not equate to conferring governmental-entity status." *Id.* The same is true here. While ERCOT is subject to statutory restrictions and requirements that do not generally apply to non-governmental organizations, those restrictions and requirements do not change ERCOT's fundamental nature as a private organization. It is heavily regulated; but those regulations do not confer governmental-entity status. *See id.* Likewise, although ERCOT argues it serves a public purpose, doing so "does not ipso facto equate to status as a governmental entity" for immunity purposes. *See id.*

---

[7] We decline to comment about whether making binding law is the "quintessential sovereign power."

### 4. ERCOT Does Not Receive Tax Revenue

Sovereign immunity prevents the "judiciary from interfering with the Legislature's prerogative to allocate tax dollars." *UIW II*, 602 S.W.3d at 404, 409; *see also Amex Props.*, 602 S.W.3d at 528 (same). ERCOT argues that extending immunity protects the public treasury because ERCOT is funded with statutorily authorized fees, which are public money. Panda maintains ERCOT receives no tax revenue.

ERCOT is funded in part by the system administration fee, which it argues "has every hallmark of a regulatory fee." It then asserts that regulatory fees such as the system administration fee are collected under the general police powers of the State. ERCOT argues "the system administration fee is collected using *the State's*— not ERCOT's—authority." ERCOT believes its fee revenue "is thus state money. And the fact that ERCOT is permitted to not only collect, but use, this public money is indicative of its governmental status."

ERCOT's argument requires logical leaps unsupported by case law. ERCOT cites *H. Rouw Co. v. Texas Citrus Commission*, 247 S.W.2d 231, 234 (Tex. 1952), for the proposition that regulatory fees are collected using the State's police powers. In *Rouw*, the Court examined whether assessments levied against citrus growers were taxes or regulatory fees. While the assessments in question were used, in part, to advertise and enlarge the markets for Texas citrus fruits and to conduct research beneficial to the citrus industry, their primary purpose was to raise revenue in excess

of the amount needed for regulation of the industry. *See id.* at 234. Because the purpose of the fees was to raise revenue rather than regulation, the fees were occupation taxes and not regulatory fees. *See id.*; *see also Tex. Boll Weevil Eradication Found., Inc. v. Lewellen*, 952 S.W.2d 454, 462 (Tex. 1997), *as supplemented on denial of reh'g* (Oct. 9, 1997) (discussing *Rouw*). The *Rouw* court did not conclude regulatory fees are collected using the State's police power; the *Rouw* court concluded the relevant assessments were occupation taxes. *See Rouw*, 247 S.W.2d at 234. To the extent ERCOT relies on *Rouw* for the proposition that regulatory fees are collected under the general police power of the State, we do not believe the court reached that conclusion.

"ERCOT does not receive funding from the State; on the contrary, ERCOT charges 'wholesale buyers and sellers a system administration fee' to cover its expenses." *See HWY 3 MHP, LLC v. Elec. Reliability Council of Tex.*, 462 S.W.3d 204, 211 (Tex. App.—Austin 2015, no pet.) (quoting TEX. UTIL. CODE ANN. § 39.151(e)). Instead of being funded by the State, ERCOT has several sources of funding. *See* 16 TEX. ADMIN. CODE §§ 25.363(a) ("This section applies to the budget of and all fees and rates levied or charged by [ERCOT]"), (b) (ERCOT's "accounts shall show all revenues resulting from the various fees charged by ERCOT"), (e) (ERCOT charges a system administration fee), (g) ("ERCOT may charge reasonable user fees for services provided by ERCOT to any market participant or other

entity."). ERCOT also charges membership fees to its members. ERCOT can obtain debt financing with the PUC's approval. TEX. UTIL. CODE ANN. § 39.151(d-2).

ERCOT assesses and collects each of these fees without the coercive power of the State. While the system administration fee is authorized by statute and the PUC sets a range for the fee, it is ERCOT that sets and charges the fee. *See* TEX. UTIL. CODE ANN. § 39.151(e) ("[T]he commission shall authorize [ERCOT] to charge to wholesale buyers and sellers a system administration fee, within a range determined by the commission."); 16 TEX. ADMIN. CODE § 25.363(e). The fee is not set or charged by an arm of the State; it is set and charged by a private entity. Accordingly, affording immunity to ERCOT will not protect the public fisc. ERCOT does not argue the fees outside the system administration fee and any debt financing it could raise are part of the public fisc or that these fees or debt could not be used to pay a money judgment in this case.

If ERCOT is subject to a monetary judgment arising out of this litigation, then ERCOT and the PUC could choose to raise ERCOT's various fees or pursue debt financing or some combination thereof if ERCOT needs additional funds to pay a judgment. But any judgment will not be paid with tax revenue. While an increase in the system administration fee may be a cost passed on to consumers, those additional costs are not increases in public expenditures and are certainly not "unforeseen expenditures associated with the government's defending lawsuits and paying judgments." *Rosenberg*, 571 S.W.3d at 751. "Because no tax dollars are at stake in

this suit, it presents no separation-of-powers risk of judicial reallocation." *UIW II*, 602 S.W.3d at 409. Sovereign immunity "guard[s] against the unforeseen expenditures associated with the government's defending lawsuits and paying judgments that could hamper government functions by diverting funds from their allocated purposes." *Id.* at 403. In this instance, the government will not pay any judgment Panda may obtain against ERCOT. *See id.* at 410. Any costs ERCOT incurs will fall on ERCOT, which fully funds its own operations. *See id.*

Finally, ERCOT argues that PURA section 39.151(d), which permits the PUC to decertify ERCOT and transfer ERCOT's assets to a successor organization, demonstrates ERCOT's need for immunity in this lawsuit. Here, the supreme court's analysis of public fisc concerns in *UIW II* is instructive. When addressing the protection of the public treasury, the university argued that private universities would disband their police departments absent a finding that the universities have sovereign immunity. *See UIW II*, 602 S.W.3d at 409. And, if private universities declined to form or dissolved their existing police departments over liability concerns, neighboring law enforcement agencies would have to fill the void, requiring an increase in public funding. *See id.* The university asked the court to consider the "indirect costs to the government should private universities discontinue their police departments." *Id.* In response, the supreme court noted that any judgment against the university would be paid by the university and not by the government or its taxpayers. *Id.* at 410. "Speculation that private universities might disband campus

police departments does not justify an unprecedented expansion of sovereign immunity to the private arena." *Id.* "The University warns against possibly higher operating costs for government police departments, not *unforeseen* expenditures from lawsuits and judgments." *Id.*

Like those of the university in *UIW II*, ERCOT's arguments that the PUC may decertify ERCOT or that Panda may take ERCOT's revenue and property, thus leaving State priorities unfunded and depriving ERCOT's successor of the assets it requires to carry out its public functions, are speculative and do not "justify an unprecedented expansion of sovereign immunity to the private arena." *Id.* ERCOT essentially warns that any successor would be forced to find a revenue source to purchase assets needed to act as the ISO. While those costs could result in higher operating costs for a new ISO, they are not unforeseen *government* expenditures from lawsuits or judgments. *See id.* Even if the public must pay higher rates for its electricity as a result of a finding against ERCOT in this lawsuit, immunity "has never been defended as a mechanism to avoid any and all increases to public expenditures." *Id.*

### 5.    PUC Rules

Our conclusion that ERCOT is not entitled to sovereign immunity is consistent with the PUC's administrative rules.[8] The Texas Administrative Code

---

[8] The PUC filed amicus briefs on behalf of ERCOT, arguing ERCOT has immunity. In those briefs, the PUC did not discuss these provisions of the Texas Administrative Code.

states: "ERCOT shall not be liable in damages for any act or event that is beyond its control and which could not be reasonably anticipated and prevented through the use of reasonable measures . . .." 16 TEX. ADMIN. CODE § 25.361(c). ERCOT likewise is not liable for its ordinary negligence when it exercises its power to cause the interruption of transmission service for the purpose of maintaining the ERCOT system stability and safety, but it may be liable for "its gross negligence or intentional misconduct when legally due." 16 TEX. ADMIN. CODE § 25.200(d). Finally, when considering the PUC's response to ERCOT's failures to comply with PURA, a provision of the chapter, or a commission order, the PUC may take specific actions; those actions, however, do not "preclude any form of civil relief that may be available under federal or state law." 16 TEX. ADMIN. CODE § 25.362(j).

We treat the PUC's administrative rules like statutes for the purpose of statutory interpretation. *See TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 438 (Tex. 2011) ("We further interpret administrative rules, like statutes, under traditional principles of statutory construction."). We must give effect to all words of a statute and not treat any as surplusage. *See In re CenterPoint Energy Houston Elec., LLC*, 629 S.W.3d 149, 159 (Tex. 2021) (orig. proceeding). If we find ERCOT is entitled to sovereign immunity, these provisions become mere surplusage. Thus, to give effect to and avoid nullifying the PUC's own rules relating to ERCOT, we can only conclude ERCOT is liable for damages unless otherwise stated—a finding inconsistent with endowing ERCOT with sovereign immunity.

### 6. *Derivative Immunity*

ERCOT argues in the alternative that it is entitled to derivative immunity for the regulatory functions it performs at the behest of the PUC.[9] Specifically, ERCOT asks that we extend federal precedent relating to "self-regulatory organizations" (SROs); federal courts have held SROs have absolute immunity. In *Panda I*, this Court adopted ERCOT's argument and concluded ERCOT functioned like an SRO and was entitled to sovereign immunity from private damages suits in connection with the discharge of its regulatory responsibilities. *See Panda I*, 552 S.W.3d at 318. That conclusion was erroneous.

The rule granting SROs immunity has its roots in the Supreme Court's decision in *Butz v. Economou*, 438 U.S. 478 (1978), which began the process of extending the type of immunity previously limited to judicial officers to other high governmental officials. *Rabin v. NASDAQ OMX PHLX LLC*, 182 F. Supp. 3d 220, 237 (E.D. Pa. 2016), *aff'd*, 712 Fed. App'x 188 (3d Cir. 2017). Today, "[t]here is no question that an SRO and its officers are entitled to absolute immunity from private damages suits in connection with the discharge of their regulatory responsibilities." *Standard Inv. Chartered, Inc. v. Nat'l Ass'n of Sec. Dealers, Inc.*, 637 F.3d 112, 115 (2d Cir. 2011) (citing *DL Capital Grp., LLC v. Nasdaq Stock Mkt., Inc.*, 409 F.3d

---

[9] The supreme court has not made clear whether the doctrine of derivative immunity is recognized in Texas. *See generally Nettles*, 606 S.W.3d at 733; *Brown & Gay Eng'g, Inc. v. Olivares*, 461 S.W.3d 117, 126 (Tex. 2015). Thus, as the supreme court did in *Nettles* and *Brown & Gay*, we will consider whether ERCOT might be entitled to an extension of the PUC's immunity from suit as if—but without holding that—the doctrine of derivative immunity is recognized in Texas.

93, 96 (2d Cir. 2005)). The Texas Supreme Court has not extended this doctrine to heavily regulated entities such as ERCOT.

SROs perform "a variety of regulatory functions that would, in other circumstances, be performed by a government agency," and for which the government would enjoy immunity. *See Barbara v. NYSE*, 99 F.3d 49, 59 (2d Cir. 1996). Therefore, courts extended absolute immunity to SROs when they perform regulatory tasks. *See id.* SROs and their officers are entitled to absolute immunity from private suits "when they perform their statutorily delegated adjudicatory, regulatory, and prosecutorial functions." *Weissman v. Nat'l Ass'n of Secs. Dealers, Inc.*, 500 F.3d 1293, 1296 (11th Cir. 2007). But SROs also engage in non-governmental activities that serve their private business interests. *See id.* Courts determine whether immunity applies on a case-by-case basis. *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 96 (2d Cir. 2007).

The doctrine "is of a rare and exceptional character," and the party seeking immunity bears the burden of demonstrating it is warranted. *Id.* When deciding whether a SRO is entitled to immunity, courts consider "the nature of the function performed, not the identity of the actor who performed it." *Id.* (quoting *Forrester v. White*, 484 U.S. 219, 229 (1988)).

As an initial matter, we decline to extend a doctrine that, up until this point, has applied only to self-regulatory organizations. ERCOT is not an SRO. After observing that "federal case law dealing with SRO immunity appears to be limited

to cases involving federal securities regulators," the Court's opinion in *Panda I* failed to provide a helpful analysis on this point. *Panda I*, 552 S.W.3d at 318. We, however, believe it must be given more weight. We have found no case law in Texas, except *Panda I*, expanding absolute immunity bestowed on SROs to entities beyond federal securities regulators. And we decline ERCOT's invitation to be the first to do so. We remain mindful of the supreme court's recent statement that, to date, it has "yet to extend sovereign immunity to a purely private entity—one neither created nor chartered by the government—even when that entity performs some governmental functions." *UIW II*, 602 S.W.3d at 401. And yet ERCOT requests we do so by applying federal case law doctrine in this case.

Second, the justification for derivative immunity applied to SROs is that Congress has enabled the SROs to perform regulatory functions that would otherwise be performed by the government, and the government would be immune when performing such functions. *See In re NYSE Specialists Sec. Litig.*, 503 F.3d at 100; *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 428, 449 (S.D.N.Y. 2013). In contrast, the Texas Utilities Code provides that ERCOT's primary mission is to act as a private system operator with responsibility for ensuring access to the transmission and distribution systems for all buyers and sellers of electricity on nondiscriminatory terms; ensuring the reliability and adequacy of the regional electrical network; ensuring that information relating to a customer's choice of retail electric provider is conveyed in a timely manner to the persons who need

that information; and ensuring that electricity production and delivery are accurately accounted for among the generators and wholesale buyers and sellers in the region. TEX. UTIL. CODE ANN. § 39.151(a), (c). The record does not establish that these are regulatory functions that would, in other circumstances, be performed by the government. Additionally, even if the record did establish that fact, Panda specifically complains that ERCOT, exercising its own discretion, issued false and misleading CDR Reports, press releases, presentations, and press interviews. The record certainly does not show that ERCOT's actions about which Panda complains are actions that would, in other circumstances, be performed by the government.

We decline ERCOT's invitation to extend a doctrine "of rare and exceptional character" without precedent to do so.

### 7.    *Legislative Amendments*

After this Court issued its opinion in *Panda I* and the trial court entered its order granting ERCOT's plea to the jurisdiction but before the supreme court issued its opinion in *Panda I Appeal*, the 87th Legislature amended provisions of the utilities code relevant to ERCOT. None of those amendments purports to bestow sovereign immunity on ERCOT or waive the immunity this Court found in *Panda I*. "[L]egislative silence . . . may reflect many things, including implied delegation to the courts or administrative agencies, lack of consensus, oversight, or mistake." *Brown v. De La Cruz*, 156 S.W.3d 560, 566 (Tex. 2004). Although both parties make arguments construing the Legislature's silence in their favor, we decline to reach

conclusions about what, if anything, the Legislature hoped to convey to the courts by its actions and inactions. *See Sanchez v. Schindler*, 651 S.W.2d 249, 252 (Tex. 1983) (We can infer nothing from this inaction because a "legislature legislates by legislating, not by doing nothing, not by keeping silent.").

### 8. Conclusion

We discern no legislative directive that ERCOT, a private, independent, membership-based, nonprofit organization, has sovereign immunity. *See UIW II*, 602 S.W.3d at 411. PURA does not evince a clear legislative intent to vest ERCOT with the nature, purposes, and powers of an arm of the State government. *See id.* at 405. Although ERCOT's activities benefit the public, its arguments for extending the doctrine of sovereign immunity "do not comport with the doctrine's historic justifications: preserving the separation of government power and protecting the public treasury from lawsuits and judgments." *Id.* at 401–02. To date, the supreme court has not extended sovereign immunity to a purely private entity neither chartered nor created by the State, and this Court will not create new precedent by extending sovereign immunity to ERCOT.

### C. Exclusive Jurisdiction

We now turn to ERCOT's argument that Panda's claims must be dismissed because they fall within the PUC's exclusive jurisdiction. Whether the PUC has exclusive jurisdiction over an issue is a question of statutory interpretation that we

review de novo. *See In re CenterPoint Energy*, 629 S.W.3d at 154 (citing *Oncor Elec. Delivery Co. v. Chaparral Energy, LLC*, 546 S.W.3d 133, 138 (Tex. 2018)).

### 1.    Law on Exclusive Jurisdiction

District courts are presumed to possess subject matter jurisdiction over a dispute in the absence of a contrary showing. *Id.*; *see also* TEX. CONST. art. V, § 8 (Texas state district courts possess "exclusive, appellate, and original jurisdiction of all actions, proceedings, and remedies, except in cases where exclusive, appellate, or original jurisdiction may be conferred by this Constitution or other law on some other court, tribunal, or administrative body.").

Conversely, agencies such as the PUC do not share the jurisdictional presumption of district courts. *See In re CenterPoint Energy*, 629 S.W.3d at 154 (citing *In re Entergy Corp.*, 142 S.W.3d 316, 322 (Tex. 2004) (orig. proceeding)). Agencies are legislative creations with only those powers expressly conferred and necessary to accomplish their duties. *See Chaparral Energy*, 546 S.W.3d at 138; *see also In re CenterPoint Energy*, 629 S.W.3d at 154 (administrative bodies "may exercise only powers conferred in clear and express statutory language"). The party asserting an agency's exclusive jurisdiction bears the burden to establish the Legislature divested the district court of subject matter jurisdiction with respect to the disputed issues. *See In re CenterPoint Energy*, 629 S.W.3d at 156.

An agency has exclusive jurisdiction when statutory language "clearly expresses" the Legislature's intent is to confer such jurisdiction or "when a pervasive

regulatory scheme indicates that the Legislature intended for the regulatory process to be the exclusive means of remedying the problem to which the regulation is addressed." *Id.* (quoting *Chaparral Energy*, 546 S.W.3d at 138). While the supreme court has noted that "PURA includes both express exclusivity language and a pervasive scheme," the court also "recognized that '[a]ll regulatory schemes have limitations,' so we must determine whether issues underlying plaintiffs' claims 'fall[] within [the PUC's] jurisdictional scope.'" *Id.* (quoting *Chaparral Energy*, 546 S.W.3d at 139). Today we make a similar determination with respect to Panda's claims against ERCOT.

### 2. *Express Grant of Authority*

Although ERCOT does not argue that the Legislature expressly granted the PUC exclusive jurisdiction to adjudicate Panda's claims, we consider that issue out of an abundance of caution. We also gain insight from the analysis surrounding the Legislature's expressed intent and corresponding silence.

PURA includes several express grants of exclusive jurisdiction to the PUC; however, none of those grants apply to claims against ERCOT. For example, section 32.001 of the Texas Utilities Code is titled "Commission Jurisdiction," and it grants the PUC "exclusive" jurisdiction in two instances. *See* TEX. UTIL. CODE ANN. § 32.001. First, except as provided in section 32.002, which governs municipally owned utilities, "the Commission has exclusive original jurisdiction over the rates, operations, and services of an electric utility" in specific geographic areas. *Id.*

–37–

§ 32.001(a). Second, the PUC has "exclusive appellate jurisdiction to review an order or ordinance of a municipality exercising exclusive original jurisdiction under this subtitle." *Id.* § 32.001(b). Similarly, section 52.002(a) states "the commission has exclusive original jurisdiction over the business and property of a telecommunications utility in this state subject to the limitations imposed by this title." *Id.* § 52.002(a). Through these provisions, the Legislature clearly expressed its intent to confer exclusive jurisdiction over the described disputes on the commission.

We cannot ignore the Legislature's explicit jurisdictional grants where the Legislature deemed it appropriate juxtaposed with the Legislature's silence elsewhere. *See Hogan v. Zoanni*, 627 S.W.3d 163, 169 (Tex. 2021) (explaining courts presume the Legislature chose statutory language deliberately and purposefully and likewise excluded language deliberately and purposefully). Upon review of the applicable statutes, we conclude the Legislature did not expressly grant exclusive jurisdiction over Panda's claims to the PUC.

### 3.     *Pervasive Regulatory Scheme*

Because the Legislature did not expressly grant exclusive jurisdiction to the PUC to adjudicate claims against ERCOT, we must consider whether the Legislature established "a pervasive regulatory scheme [that] indicates that the Legislature intended for the regulatory process to be the exclusive means of remedying the problem to which the regulation is addressed." *In re CenterPoint Energy*, 629

S.W.3d at 156. In its arguments, ERCOT focuses on whether it is part of a "pervasive regulatory scheme" without considering whether that scheme "indicates that the Legislature intended for the regulatory process to be the exclusive means of remedying the problem to which the regulation is addressed." *See id.* We conclude the scheme does not.

a.   ERCOT is Heavily Regulated

ERCOT is heavily regulated and answerable to the PUC on a multitude of issues. *See, e.g.*, TEX. UTIL. CODE ANN. § 39.151; 16 TEX. ADMIN. CODE §§ 25.361, 25.362. ERCOT explains the many ways it is overseen and regulated by the PUC and argues heavy regulation is equivalent to existing within a pervasive regulatory scheme. Therefore, ERCOT concludes, the regulatory process must be the exclusive means of remedying the issues about which Panda complains. We disagree; we will not conflate heavy regulation with the type of pervasive regulatory scheme required to establish exclusive jurisdiction. *See Rosenberg*, 571 S.W.3d at 750. Indeed, the supreme court has made clear that the PUC's jurisdiction to regulate activities is separate from the PUC's authority to adjudicate disputes. *See In re CenterPoint Energy*, 629 S.W.3d at 156–58.

PURA specifically addresses which disputes involving ERCOT the commission may resolve. PURA section 39.151 addresses the PUC's and ERCOT's respective responsibilities, including the functions of the ISO, TEX. UTIL. CODE ANN. § 39.151(a); creation and adoption of rules relating to the reliability of the regional

electrical network, *id.* § 39.151(d); and the PUC's oversight of ERCOT's finances, budget, operations, debt financing or debt refinancing, *id.* § 39.151(d)–(d-4). Only one subsection, however, discusses dispute resolution. Section 39.151(d-4)(6) states the commission may

> (6) resolve disputes between an affected person and an independent organization and adopt procedures for the efficient resolution of such disputes.

*Id.* § 39.151(d-4)(6). An "affected person" is defined to be (a) a public utility or electric cooperative affected by an action of a regulatory authority; (b) a person whose utility service or rates are affected by a proceeding before a regulatory authority; or (c) a person who is a competitor of a public utility with respect to a service performed by the utility or wants to enter into competition with a public utility. *Id.* § 11.003(1).

Section 39.151(d-4)(6) is clear: the PUC's jurisdiction to resolve disputes involving ERCOT is limited to resolving disputes between ERCOT and an affected person. None of the Panda entities is an "affected person," as defined by the statute, and thus, the statute does not confer jurisdiction on the PUC to resolve a dispute between ERCOT and Panda.

ERCOT cites *Entergy* and *Chaparral Energy* to support its exclusive jurisdiction argument. In *Entergy*, the supreme court considered whether the PUC had exclusive jurisdiction over a claim that a utility breached a PUC-approved agreement. *See In re Entergy Corp*, 142 S.W.3d at 319–20. The court examined

–40–

utility code sections 31.001 and 32.001. *See id.* at 323. Section 31.001(a) states the "purpose of this subtitle is to establish a comprehensive and adequate regulatory system *for electric utilities to assure rates, operations, and services* that are just and reasonable to the consumers and to the electric utilities." TEX. UTIL. CODE ANN. § 31.001 (emphasis added). Section 32.001 gives the PUC exclusive original jurisdiction over the rates, operations, and services of an electric utility in specific geographic areas. *Id.* § 32.001. The *Entergy* court wrote that "the statutory description of PURA as 'comprehensive' demonstrates the Legislature's belief that PURA would comprehend all or virtually all pertinent considerations *involving electric utilities* operating in Texas. That is, PURA is intended to serve as a 'pervasive regulatory scheme.'" *In re Entergy Corp.*, 142 S.W.3d at 323 (emphasis added). Further, section 32.001's jurisdictional grant shows the Legislature intended disputes regarding utility rates, operations, and services to be resolved by the PUC. *See id.* From these provisions, the court concluded the PUC had exclusive jurisdiction over the dispute at issue. *Id.*

In *Chaparral Energy*, Oncor, a public transmission-and-distribution utility regulated by the PUC, was sued by a commercial customer for breach of contract. *See Chaparral Energy*, 546 S.W.3d at 136–37. The plaintiff, Chaparral Energy, alleged Oncor failed to act in good faith and fulfill its duties and obligations under the parties' agreement; Oncor did not use reasonable diligence or act in a manner consistent with good business practices, reliability, safety, and expedition; and

–41–

Oncor "engaged in intentional misconduct" and was grossly negligent. *See id.* at 137.

The case proceeded to trial, and the jury found in favor of Chaparral Energy. *See id.*

After trial, Oncor moved to dismiss Chaparral Energy's claims for want of

jurisdiction, arguing the PUC had exclusive jurisdiction over the claims at issue. *See*

*id.* Considering Oncor's arguments in favor of exclusive jurisdiction, the supreme

court stated:

> The Texas Public Utility Regulatory Act (PURA) grants the PUC broad powers to "regulate and supervise the business of *each public utility* within its jurisdiction and to do anything specifically designated or implied by [PURA] that is necessary and convenient to the exercise of that power and jurisdiction." TEX. UTIL. CODE § 14.001. PURA's express purpose "is to establish a comprehensive and adequate regulatory system *for public utilities to assure rates, operations, and services* that are just and reasonable to the consumers and to the utilities" and "to grant the [PUC] authority to make and enforce rules necessary to protect customers of . . . electric services consistent with the public interest." *Id.* § 11.002(a), (c). It reiterates this purpose in Subtitle B, *which governs electric utilities* like Oncor. *Id.* § 31.001(a). It also provides that it "shall be construed liberally to promote the effectiveness and efficiency of *regulation of public utilities*." *Id.* § 11.008.

*Id.* at 138 (emphasis added). The supreme court concluded the PUC had exclusive

jurisdiction "to resolve issues underlying a customer's claim that a PUC-regulated

utility breached a contract by failing to timely provide electricity services." *Id.* at

136.

While ERCOT contends these two cases demonstrate that PURA established

a comprehensive regulatory system that also applies to Panda's claims, we cannot

read these cases so broadly. The statutory provisions on which these opinions rely

specifically address utilities and a comprehensive system for utilities to assure rates, operations, and services.  But ERCOT is not a utility, and this dispute is not about utility rates, operations, or services. ERCOT is a system operator, and this case arises from Panda's allegations of fraud, negligent misrepresentation, and breach of fiduciary duty. Thus, while the supreme court has concluded the PUC has exclusive jurisdiction over some (but not all) disputes involving utilities, we do not consider that conclusion relevant to the present dispute.

b.      Allegations in Panda's Suit

ERCOT encourages us to look beneath the words Panda used to plead its common law complaints to determine whether "the problem" underlying those claims is one over which the Legislature intended an agency to have exclusive jurisdiction. Discussing and quoting Panda's Second Amended Original Petition, ERCOT asserts "the problem" at the heart of Panda's claims "is Panda's contention that ERCOT failed to act with 'competence or independence' in publishing its 2011 and 2012 CDRs and the 'science underlying' those reports 'was so unsound as to be wholly unreliable.'" According to ERCOT, Panda's allegations challenge ERCOT's independence, which goes "to the core of the PUC's authority over ERCOT" because the Legislature gave the PUC "explicit, exclusive control over issues related to ERCOT's competence." Citing PURA section 39.151(d), ERCOT maintains it is "directly responsible" to the PUC. And since the PUC has authority over ERCOT,

the PUC can discipline ERCOT, and this lawsuit implicates ERCOT's competence, ERCOT concludes the PUC must have exclusive jurisdiction over Panda's claims.

We agree with ERCOT's premise that the PUC exercises extensive authority over ERCOT; however, we cannot agree with ERCOT's conclusion that Panda's claims as presented in its Second Amended Petition fall exclusively within the PUC's jurisdiction. While ERCOT quotes select portions of Panda's Second Amended Petition to support its argument, additional context is helpful to our analysis. Panda alleged ERCOT, acting "either alone or in complicity with others, sponsored false and misleading" CDR Reports. Panda alleges ERCOT developed a "plan to spur investment," and Panda's pleading lists steps ERCOT allegedly took to "condition the market" to encourage investment in new power plants; ERCOT knew that by depicting "extreme capacity shortfalls," investors would be "lure[d]" into constructing new plants. Panda alleges "ERCOT had more than ample motive to generate power development through false market information." Panda maintains it relied on ERCOT's numerous misrepresentations when it decided to build three power plants. Panda's Second Amended Petition states that after it made investments to build new plants,

> 55. Information slowly surfaced showing that ERCOT's methodology and data points used in the 2011 and 2012 CDRs were either seriously flawed or rigged. Questions began to surface as to whether ERCOT knew about the defective forecasting but suppressed this fact to induce construction of plants without capacity payments. Questions arose concerning ERCOT's competency and independence,

–44–

and whether the science underlying the CDRs was so unsound as to be wholly unreliable.

56. In the 2011 and 2012 CDRs, ERCOT took great care on its website to disclaim any responsibility for the accuracy of the data supplied by market participants upon which the CDRs were based. But nowhere did ERCOT disclose doubts about its own methodology. Nowhere did ERCOT warn market participants that its science was unsound, or that it lacked the competence or independence to produce reliable assessments of capacity, demand, or reserves. At no time did Plaintiffs assent to any attempt by ERCOT to limit its responsibility or liability for misconduct in connection with the CDRs.

Although Panda's allegations arise from the content of ERCOT's CDR Reports in 2011 and 2012 (as well as ERCOT's press releases, presentations, and press interviews), Panda alleges ERCOT used these tools to intentionally provide false information to the market. The PUC requires ERCOT to prepare the CDR Reports, *see* 16 TEX. ADMIN. CODE ANN. § 25.505(c), but the PUC does not dictate the content of the reports. A January 2013 memorandum from the PUC states the "inputs, assumptions, and formats of the CDR report are determined by ERCOT staff." The same memorandum states the then-existing methodology for producing the CDR reports was approved by ERCOT's board of directors in 2009.

Panda alleges ERCOT produced the CDR Reports as required, but, exercising its own authority and discretion, ERCOT knowingly issued false and misleading reports. Panda alleges ERCOT failed to act independently, not from the PUC, but from others with whom it allegedly was complicit in its efforts to sponsor the false or misleading reports. Likewise, Panda does not challenge ERCOT's overall competence as ERCOT suggests, but alleges ERCOT failed to act competently when

–45–

it "sponsored false and misleading" CDR Reports. This case is not about PUC oversight or the PUC's authority over ERCOT. This case is about allegedly false representations ERCOT made to the market for the purpose of luring investors to build new power plants, and Panda's alleged reliance on them.

ERCOT argues that, if it performed inadequately, then the Legislature gave the PUC explicit power to discipline ERCOT for any inadequate performance, thus precluding private causes of action. *See* TEX. UTIL. CODE ANN. § 39.151(d) ("The commission may take appropriate action against an organization that does not adequately perform the organization's functions or duties or does not comply with this section, including decertifying the organization or assessing an administrative penalty against the organization."). When taken to its logical end, this argument would mean ERCOT could never be liable to anyone other than the PUC for its bad acts, no matter how intentional or egregious those acts may be. We do not agree that is the law. The various provisions on which ERCOT relies may delineate authority, but they do not exclude judicial authority over Panda's common law claims. *See Forest Oil Corp. v. El Rucio Land & Cattle Co., Inc.*, 518 S.W.3d 422, 428–49 (Tex. 2017). Statutory provisions authorizing the PUC to regulate ERCOT do not suggest, let alone clearly indicate, that the PUC's authority is intended to be exclusive of common law actions. *See id.* at 429. Accordingly, the PUC's disciplinary role does not preclude Panda from pursuing its common law claims in district court.

The PUC's regulations also do not comport with ERCOT's arguments. The PUC's own regulations state:

> (j) Compliance with rules or orders. ERCOT shall inform the commission with as much advance notice as is practical if ERCOT realizes that it will not be able to comply with PURA, any provision of this chapter, or a commission order. If ERCOT fails to comply with PURA, any provision of this chapter, or a commission order, the commission may, after notice and opportunity for hearing, adopt the measures specified in this subsection or such other measures as it determines are appropriate.
>
> (1) The commission may require ERCOT to submit, for commission approval, a proposal that details the actions ERCOT will undertake to remedy the non-compliance.
>
> (2) The commission may require ERCOT to begin submitting reports, in a form and at a frequency determined by the commission, that demonstrate ERCOT's current performance in the areas of non-compliance.
>
> (3) The commission may require ERCOT to undergo an audit performed by an appropriate independent third party.
>
> (4) The commission may assess administrative penalties under PURA Chapter 15, Subchapter B.
>
> (5) The commission may suspend or revoke ERCOT's certification under PURA § 39.151(c) or deny a request for change in the terms associated with such certification.
>
> (6) Nothing in this section shall preclude any form of civil relief that may be available under federal or state law.

16 TEX. ADMIN. CODE § 25.362(j). The PUC could not have been clearer when stating that nothing in its rules for disciplining ERCOT "shall preclude any form of civil relief that may be available under federal or state law." *Id.* § 25.362(j)(6). Consistent with PURA, the PUC's rules demonstrate the PUC is not the path to redress Panda's alleged injuries.

We conclude "the problem" at the heart of Panda's suit is a series of allegations that ERCOT acted either alone or in concert with others to purposefully mislead the market and induce investors such as Panda to build new power plants. This "problem" does not fall exclusively within the PUC's jurisdiction.

c.     Abrogation of Common Law Complaints

While maintaining the PUC is the proper forum for Panda's complaints, ERCOT alternatively argues that even if the PUC lacks jurisdiction to consider "the problem" that Panda presents, then "that would just mean the Legislature abrogated Panda's claims—as it has the power to do." For the limited purpose of this argument, ERCOT accepts that section 39.151(d-4)(6) deprives the PUC of jurisdiction over Panda's claims. ERCOT then concludes, however, that section 39.151(d-4)(6) "implements a legislative choice to allow claims related to ERCOT's conduct by entities that qualify as 'affected persons,' while abrogating the claims of those that do not."

We begin by noting the PUC's own regulations do not comport with this analysis. As discussed above, the administrative code states "[n]othing in this section shall preclude any form of civil relief that may be available under federal or state law." *Id.* Panda asserts common law claims for negligent misrepresentation, fraud, and breach of fiduciary duty. Panda's common law claims are a form of civil relief available under state law.

Additionally, "[a]brogation of a common-law right . . . is disfavored and requires a clear repugnance between the common-law cause of action and the statutory remedy. A statute's express terms or necessary implications must indicate clearly the Legislature's intent to abrogate common-law rights. Absent such a clear indication, the [agency] did not have exclusive jurisdiction over the claims at issue." *Forest Oil*, 518 S.W.3d at 428 (footnotes and internal quotation marks omitted).

In this case, there is no "clear repugnance" between Panda's claims and PURA. While the PUC may choose to discipline ERCOT for the behavior alleged in Panda's complaints, the statutory provision empowering the PUC to do so is not inconsistent with Panda pursuing its claims in district court. Further, nothing in PURA's express terms or necessary implications suggests the Legislature intended to abrogate common law rights. Absent a clear indication, we cannot conclude the Legislature intended to abrogate Panda's common law rights.

### 4. Conclusion

In the absence of an express grant of authority, an agency has exclusive jurisdiction where the Legislature created a pervasive regulatory scheme that "*indicates that the Legislature intended for the regulatory process to be the exclusive means of remedying the problem to which the regulation is addressed.*" *In re CenterPoint Energy*, 629 S.W.3d at 156 (emphasis added) (quoting *Chaparral Energy*, 546 S.W.3d at 138). ERCOT exists within a regulatory scheme; however, that regulatory scheme does not indicate the Legislature intended for the regulatory

–49–

process to be the exclusive means of remedying the problem to which the regulation is addressed, much less the problems about which Panda complains.

We conclude ERCOT did not meet its burden to prove the Legislature clearly stated its intent for the PUC alone to resolve the type of claims Panda asserts against ERCOT. Absent a clear indication otherwise, we accept the presumption that the district court has subject matter jurisdiction over the dispute. *See id.* at 154; *see also* TEX. CONST. art. V, § 8. We conclude the PUC does not have exclusive jurisdiction to adjudicate the common law fraud, negligent misrepresentation, and breach of fiduciary duty claims that Panda asserts against ERCOT.

CONCLUSION

We reverse the trial court's April 24, 2018 order granting defendant's plea to the jurisdiction based on sovereign immunity and dismissing this case for lack of jurisdiction. We remand this case to the trial court for further proceedings.

/Erin A. Nowell//
ERIN A. NOWELL
180611f.p05                              JUSTICE

Schenck, J., dissenting



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

PANDA POWER GENERATION INFRASTRUCTURE FUND, LLC, D/B/A/ PANDA POWER FUNDS; PANDA SHERMAN POWER HOLDINGS, LLC; PANDA SHERMAN POWER INTERMEDIATE HOLDINGS I, LLC; PANDA SHERMAN POWER INTERMEDIATE HOLDINGS II, LLC; PANDA SHERMAN POWER, LLC; PANDA TEMPLE POWER HOLDINGS, LLC; PANDA TEMPLE POWER INTERMEDIATE HOLDINGS I, LLC; PANDA TEMPLE POWER INTERMEDIATE HOLDINGS II, LLC; PANDA TEMPLE POWER, LLC; PANDA TEMPLE POWER II HOLDINGS, LLC; PANDA TEMPLE POWER II INTERMEDIATE HOLDINGS I, LLC; PANDA TEMPLE POWER II INTERMEDIATE HOLDINGS II, LLC; PANDA TEMPLE POWER II, LLC, Appellants

No. 05-18-00611-CV     V.

On Appeal from the 15th Judicial District Court, Grayson County, Texas
Trial Court Cause No. CV-16-0401.
Opinion delivered by Justice Nowell. Court sitting en banc.

ELECTRIC RELIABILITY
COUNCIL OF TEXAS, INC.,
Appellee

In accordance with this Court's opinion of this date, we **REVERSE** the trial court's April 24, 2018 order granting the plea to the jurisdiction filed by appellee Electric Reliability Council of Texas, Inc. and **REMAND** this case to the trial court for further proceedings

It is **ORDERED** that appellants Panda Power Generation Infrastructure Fund, LLC d/b/a Panda Power Funds; Panda Sherman Power Holdings, LLC; Panda Sherman Power Intermediate Holdings I, LLC; Panda Sherman Power Intermediate Holdings II, LLC; Panda Sherman Power, LLC; Panda Temple Power Holdings, LLC; Panda Temple Power Intermediate Holdings I, LLC; Panda Temple Power Intermediate Holdings II, LLC; Panda Temple Power, LLC; Panda Temple Power II Holdings, LLC; Panda Temple Power II Intermediate Holdings I, LLC; Panda Temple Power II Intermediate Holdings II, LLC; and Panda Temple Power II, LLC recover their costs of this appeal from appellee Electric Reliability Council of Texas, Inc.

Judgment entered this 23rd day of February, 2022.